IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

DANIEL RUBIN,

                             Petitioner,

                                              Civil Action No.
           v.                                 9:02-CV-0639 (NAM/DEP)

HENRY GARVIN,

                             Respondent.

_____

APPEARANCES:                      OF COUNSEL:

FOR PETITIONER:

CULP LAW OFFICE                   ROBERT A. CULP, ESQ.
35 Garrison's Landing
PO Box 550
Garrison, NY 10524

FOR RESPONDENT:

HON. ELIOT SPITZER                ALYSON J. GILL, ESQ.
Office of Attorney General        Assistant Attorney General
State of New York
120 Broadway
New York, NY 10271

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

    Petitioner Daniel Rubin, a former New York State prison inmate as a

result of convictions in 1999 of second degree larceny and eight counts of

filing a false instrument in the first degree, has commenced this

proceeding seeking habeas relief pursuant to 28 U.S.C. § 2254.  While

Rubin has asserted six separate grounds for the granting of habeas relief,

at the heart of his petition is the claim that a regulation which he is

accused of having violated is unconstitutionally vague, both facially and as

applied to his circumstances.

Having reviewed petitioner's claims, applying the requisite

deferential standard, I find that he is entitled to federal habeas relief with

respect to his convictions on the second and third counts in the indictment

against him, notwithstanding the state appellate courts' rejection of his

challenge to those convictions both on procedural grounds and on the

merits.  I further conclude, however, that petitioner is not entitled to

habeas relief on his remaining claims, and therefore recommend that his

habeas petition be denied as to those other grounds asserted in his

petition.

I.    BACKGROUND

Petitioner Daniel Rubin was the founder and, at the relevant times,

President of Allstate Home Care, Inc. ("Allstate"), a company engaged in

providing home health care services primarily in Duchess County, New York.  Trial Transcript of Daniel Rubin (3/8/05) ("TT") at 602, 675.  Allstate operated out of three separate offices, employing approximately one hundred and fifty nurses aids, twenty-five nurses and twenty office staff personnel.  Although Allstate was compensated for services provided to its consumers in a variety of ways, including through direct, private payment, insurance coverage, and governmental programs, the majority of Allstate's clients received services provided through Medicaid.  E.g., Record on Appeal ("RA") at 2375, 2393.

Medicaid is a joint federal and state cost-sharing program that finances medical services to low income individuals.  *See Tyler v. Douglas*, 280 F.3d 116 (2d Cir. 2001) (citing Medicaid Act (Title XIX of the Social Security Act), 42 U.S.C. §§1396, 1396a, 1396u), *cert. denied*, 536 U.S. 906, 122 S.Ct. 2361 (2002).  In New York, the Medicaid program was administered by the New York State Department of Social Services ("DSS") through September, 1996, at which time the New York State Department of Health ("DOH") assumed responsibility for administering the program.  *K & A Radiologic Technology Services, Inc. v. Commissioner of Dept. of Health of State of N.Y.*, 189 F.3d 273, 276 n.2

3

(2d Cir. 1999).  Benefits under the Medicaid program administered in New York are provided by approved hospitals, physicians, dentists, medical equipment vendors, pharmacies and home health agencies.  TT 344.  Allstate applied for and became an approved provider of Medicaid services in New York in 1985.  TT 346-49; *see also* RA at 2042-94.

The State of New York has promulgated an extensive and complex regulatory scheme governing the administration of the Medicaid program within the state.  One applicable regulation, 18 N.Y.C.R.R. §505.14, relates to reimbursement rates for providers of personal care services.  That regulation provides, in pertinent part, that

> (1) [m]edical assistance payments to personal care services providers for any rate year beginning on or after January 1, 1994, are made at the lower of the following rates:
>
> > (i) the rate the provider charges the general public for personal care services;  or
> >
> > (ii) the rate determined by the department in accordance with [a cost-based methodology].

*See* 18 N.Y.C.R.R. §505.14(h)(7)(ii)(a)(1).[1]  The DSS re-examines and, if warranted, adjusts the hourly rates it pays Medicaid providers after

---

[1]  In their respective briefs filed with the court, the parties have referred to 18 N.Y.C.R.R. § 505.14(h)(7)(ii)(a)(1) as the "Public Charge Regulation", and I will do likewise in this report.

reviewing the "Cost Report" filed by each Medicaid provider with the agency on an annual basis.  TT 464-73.

In conjunction with its participation in the Medicaid program, Allstate submitted annual cost reports to the DSS, which were then used by the agency to determine Allstate's reimbursement rates. TT 473-74.  For the years 1993, 1994 and 1995, Rubin indicated under the section of those reports entitled "Public Fee Schedule" that Allstate's hourly "charge to the General Public" was $13.50 in 1993, and $15.25 for the years 1994 and 1995.  *See* TT 491-92; *see also* RA 2339, 2373 and 2391.  Based upon the cost reports submitted by Rubin, Allstate was reimbursed the following hourly rates under the Medicaid program for the "Level II" care which it provided:  $13.35 in 1994, $15.02 in 1995, and $14.79 in 1996.[2] *See* Petitioner's Memorandum of Law in Support of His Petition (Dkt. No. 8) ("Supporting Mem.") at 5.

The testimony at trial established that the rates which petitioner claimed were charged by Allstate to members of the general public for home care services in its annual cost reports – and which, in turn, were

---

[2]      In New York, a provider of Level II care assists individuals with laundry, cleaning, shopping, and dressing, and additionally renders total or partial assistance in bathing.  TT 467.

used by the DSS in establishing the annual reimbursement rate for that company – varied substantially from the rates that were actually charged to private individuals. Barbara Balint, described at trial as a "jack of all trades" during the time of her employment at Allstate between October, 1990 and August, 1997, TT 658-59, testified that during her tenure the rate paid by private clients for the company's services increased in the early 1990s from $11.50 per hour to $12.00 per hour, excluding holidays.[3] TT 664-65. Balint's testimony regarding the rates charged by Allstate was echoed by Ina Lynch, who similarly recalled that the hourly rate charged for private clients on all days excluding holidays increased from $11.50 per hour to $12.00 per hour. TT 608-09. Nurses who provided care for Allstate patients during the relevant time period also confirmed that the company charged an hourly rate of $11.50 in the early 1990s, and thereafter $12.00 per hour. TT 951, 993, 1101-02.[4]

The evidence adduced at trial established that petitioner knew the rates being charged for Allstate's Medicaid patients were improper under

---

[3]     These rates were described as "non-negotiable".  TT 665.

[4]     Donna Williams testified that it was Rubin's desire to charge the "lowest rate in the county" for home health care.  TT 1103-04.

the Public Charge Regulation.  According to Ina Lynch, in the Fall of 1990

Rubin informed her that the hourly rate charged by Allstate to its private

clients for its services "had to be higher than the rate set by Medicaid"

because of a "Medicaid regulation or rule."  TT 614-15.  Susan Malvert,

who began working for Allstate in October 1992 as a payroll clerk, and

eventually was promoted to the position of accounting manager before she

left in November, 1997, TT 697, similarly testified that toward the end of

1993 Rubin informed her that, with certain exceptions, he knew "the

standard private rate [charged by Allstate] must be higher than the

Medicaid rate."  TT 720.

     In addition to knowing that the rates being charged by Allstate for

caring for Medicaid patients was improper under the public charge

regulation, the evidence at trial also established that Rubin took affirmative

steps to cover up the fact that his company was charging Medicaid

patients a higher hourly rate than that charged to members of the general

public.  Malvert recalled, for example, a specific discussion which she had

with Rubin about the rate Allstate was to charge its private patients after

discovering that the 1995 Medicaid reimbursement rate had been set at

$15.02.  TT 723.  Following that conversation, two different rate sheets

7

were generated by Allstate with respect to the amount the company

allegedly charged private paying individuals, one reflecting a "regular" rate

of $15.25 per hour, while the other listed a "negotiated" or "discounted"

rate of $12.00 per hour.  TT 724-31.  Although private paying customers

were always charged based upon the discounted rate, TT 733-34, Malvert

testified that when responding to DSS inquiries requesting Allstate's rate

schedule, she provided the agency with only the "regular", rather than

"discounted", rate.[5]  TT 736-41.  Elizabeth Fernandes, an administrative

assistant at Allstate, TT 1354-55, similarly testified that Rubin instructed

her to distribute the "discounted" rate schedule to the Allstate staff and

provide that sheet when sending out rate sheets to potential clients, but

that she was to "do nothing" with the "regular" rate schedule, which

petitioner informed Fernandes was "for Medicaid".  TT 1363-65.

In the Fall of 1997, Rubin approached Malvert and asked her if she

would alter Allstate's billing invoices so that they would reflect that

individuals who had utilized the services of that company had been

charged the regular, rather than discounted, rate.  TT 760-61.  Malvert

refused this request, however, because she did not "want to be held

---

[5]        Allstate provided private patients and Medicaid patients with the same
level and types of care.  Trial Tr. at 964-65.

liable."  TT at 762-63.

Under established procedures, Medicaid providers such as Allstate
which electronically submit claims for reimbursement are required to
submit a magnetic provider transmittal certification ("Provider Transmittal
Certification") along with any claim for payment.[6]  TT 369.  Beginning in
February, 1995, claims submitted to the DSS declared:

> I have reviewed these claims: I (or the entity) have
> furnished or caused to be furnished the care,
> services and supplies itemized and done so in
> accordance with applicable federal and state laws
> and regulations.

TT 370.  Individuals executing such Provider Transmittal Certifications
also certified that

> [i]n submitting claims under this agreement I
> understand and agree that I (or the entity) shall be
> subject to and bound by all rules, regulations,
> policies, standards, fee codes and procedures of
> the New York State Department of Social Services
> as set forth in title 18 of the Official Compilation of
> Codes, Rules and Regulations of New York State
> and other publications of the Department, including
> Medicaid Management Information System
> Provider Manuals and other official bulletins of the
> Department.

---

[6]   Typically, all such claims are submitted to Computer Sciences
Corporation, a fiscal agent with which the State has contracted for the purpose of
processing Medicaid claims submitted by care providers.  TT 371-72.

RA 2179-2309 (capitalization as in originals);[7] *see also* TT 371.  In his capacity as president of Allstate, TT 4, Rubin signed scores of those Provider Transmittal Certifications in conjunction with claims made on behalf of the company for services provided to Medicaid patients.[8]  RA 2179-2309.

Philip See, an assistant chief auditor with the New York State Attorney General's Medicaid Fraud Control Unit, reviewed approximately 3,500 invoices prepared by Allstate for the years 1994, 1995 and 1996 concerning care provided by that company to private individuals.  TT 1410-27.  That review revealed that the hourly, non-holiday rate paid by non-Medicaid eligible individuals for care provided by Allstate was $11.50 during the first five months of 1994, and $12.00 for the remainder of that year.  TT 1426.  Additionally, See's audit revealed that for 1995 and 1996, the vast majority of the general public paid Allstate at a rate of $12.00 per

---

[7]     As will be seen, the above-quoted language is not contained in any of the Provider Transmittal Certifications executed by petitioner in 1994, including the two certifications forming the basis for his convictions on counts two and three in the indictment.  *See* RA 2120-2175.

[8]     Rubin was in charge of Allstate's day-to-day operations and made the policy decisions on behalf of that corporation.  TT 660.

hour for the care which it provided.[9]  *Id.*  See then calculated the amount

of the resulting overpayment by first determining the total sum overpaid by

the DSS to Allstate based upon the Medicaid hourly rate charged by

Allstate for health care services provided to Medicaid patients during the

years 1994 through 1996, and deducting the amount the agency would

have paid Allstate over that same period had it been invoiced at the

$12.00 hourly rate charged by Allstate to the general public (excluding all

holiday billing).  TT 1436-37.  Based upon that computation, See

concluded that Allstate had overcharged the DSS by $121,860.45 in 1994,

$290,723.32 in 1995 and $207,654.12 in 1996, resulting in a total of

$620,237.89 in illegal charges.[10]  TT at 1439-41.

The evidence adduced at trial also revealed that Rubin possessed

an ownership interest in an entity known as Cripple Creek Culinary

Production ("Cripple Creek"), a company formed principally to provide

placement service for chefs, though eventually evolving into a restaurant.

---

[9]     On five of the 3,500 invoices reviewed by See, Allstate billed private individuals at a rate exceeding $12.00 per hour.  TT 1426-27.  In connection with four of those five invoices, however, the recipient actually paid only $12.00 per hour for the services rendered.  TT 1431.

[10]     See also testified that by using a somewhat different methodology to ascertain the overcharges billed to the DSS, he calculated that Allstate had overcharged the agency by $665,835.85 over that same period of time.  TT 1441-56.

TT 1024.  Two of that company's employees, Kevin Vetter and Ellen

Rodriguez, utilized Allstate office space while working for Cripple Creek.

TT 1194-95.  At trial Rodriguez testified that while she never performed

work for Allstate, TT 1229, 1255-56, for a period of time her salary was

paid in the form of corporate checks from Allstate.[11]  TT 1229-30.  The trial

testimony further revealed that it was Rubin who was responsible for

placing Vetter and Rodriguez on the Allstate payroll, TT 1281, eventually

requesting that those individuals be given titles as Allstate employees

once the audit of that company had begun.  TT 1285-86.  See testified that

while the salaries of those two individuals could properly have been

included as administrative salaries in cost reports submitted by Rubin to

the DSS regarding Allstate, TT 1469, because they did not perform work

for that company those salaries should have been accounted for as non-

allowable expenses in those cost reports.  TT 1470; *see also* TT 478-79.

In the 1995 cost report petitioner filed with the DSS, however, although the

salaries of Vetter and Rodriguez were included as an administrative

expense of Allstate Home Care in one portion of that cost report, they

were not thereafter reported as non-allowable expenses of that company.

---

[11]    Rodriguez further testified that she was not aware of any work having
been performed by Vetter for Allstate.  Trial Tr. at 1230-31.

TT 1469-70.

II.     PROCEDURAL HISTORY

    A.     State Court Proceedings

In April of 1998 an Albany County grand jury returned an eleven count indictment against Rubin and Allstate.  RA 13-24, 2645.  In that accusatory instrument, Rubin was charged with one count of second degree grand larceny, stemming from his alleged, knowing submission of false claims to Computer Sciences Corporation in an aggregate amount totaling over $600,000, and six counts of filing a false instrument in the first degree, in contravention of N.Y. Penal Law § 175.35, involving Medicaid claims filed by Rubin on behalf of Allstate on April 23, 1994, August 28, 1994, August 8, 1995, October 5, 1995, September 14, 1996 and October 12, 1996, respectively.  Count eight of the indictment charged Rubin with filing a false instrument in the first degree, also in violation of N.Y. Penal Law § 175.35, in conjunction with his September 18, 1995 filing of the 1994 cost report with the DSS.  The ninth count in that accusatory instrument also charged Rubin with filing a false instrument in the first degree, based upon the reporting of administrative salaries paid by Allstate to the two Cripple Creek employees referenced above, accusing

13

him of falsely declaring in his 1995 cost report filed with the DSS that the costs associated with those two Cripple Creek employees were related to necessary patient care.[12]

By affidavit dated June 19, 1998, Rubin's pretrial counsel moved to dismiss counts one through seven of the indictment on the basis of undue vagueness.  In that motion, petitioner argued that those charges, as amplified by the People's Response to Rubin's Request for a Bill of Particulars, were premised upon his alleged violation of the Public Charge Regulation and 18 N.Y.C.R.R. § 515.2,[13] both of which he claimed were "unduly vague and [did] not provide fair notice of the crimes charged." *See* Affidavit of William J. Dreyer (6/19/98) at ¶¶ 14-16 (reproduced at RA 43-44).  By Decision/Order of Acting Supreme Court Justice Dan Lamont dated January 22, 1999, that request to dismiss the relevant counts in the indictment on the basis of vagueness was denied.  *See People v. Rubin*,

---

[12]     The tenth count in the indictment charged Rubin with knowingly filing a "Personal Care Services Rate Request and Justification Form" in February, 1994, containing a false statement, while the final count in the indictment alleged that a "Contract Arrangement with Provider Agencies" form filed by Rubin on behalf of Allstate on August 25, 1994 contained a false statement.  Prior to trial those two counts were dismissed, upon motion by the prosecution.  TT 22.

[13]     18 N.Y.C.R.R. § 515.2 prohibits Medicaid providers from seeking payment from DSS for an amount "substantially in excess of the customary charges or costs to the general public."  *See* 18 N.Y.C.R.R. § 515.2(b)(1)(i)(d).

No. AG1-5521 (Sup. Ct., Alby. Cty. Jan. 22, 1999) at 3-4.

Beginning on March 8, 1999, Rubin was tried before a jury on the remaining nine charges set forth in the indictment against him, with New York State Supreme Court Justice Paul Czajka presiding.[14]  At the conclusion of the trial, Rubin was found guilty of all charges.  TT 2184-90.

On May 14, 1999, Justice Czajka sentenced Rubin principally to a term of three and one-third to ten years of imprisonment on his second degree larceny conviction, with lesser, concurrent sentences on the convictions on counts two through eight of the indictment.  RA 2660.  As to his conviction on the ninth count, Rubin was sentenced to a term of imprisonment of one and one-third to four years, to be served consecutively to the other sentences, resulting in an aggregate sentence of four and two-thirds to fourteen years of imprisonment.  RA 2660-62.

Rubin appealed his convictions to the New York State Supreme Court Appellate Division, Third Department.  On April 13, 2000, that court issued a written decision in which it reversed Rubin's convictions on counts one through seven.  *People v. Rubin*, 271 A.D.2d 759, 706 N.Y.S.2d 225 (3d Dept. 2000).  That determination was based upon that

---

[14]    Allstate, which was named as a co-defendant in the indictment, pleaded guilty to a charge of second degree grand larceny.  TT 16.

court's determination in a related case, *Ulster Home Care, Inc. v. Vacco*,

268 A.D.2d 59, 706 N.Y.S.2d 739 (3d Dept. 2000), in which it had

concluded that the Public Charge Regulation was facially invalid.  *See*

*Ulster Home Care, Inc.*, 268 A.D.2d at 63-66, 706 N.Y.S.2d at 742-44.  In

considering the impact of its holding in *Ulster Home Care, Inc.* upon

petitioner's conviction, the Third Department determined that because the

critical regulation, with which Rubin was convicted of fraudulently certifying

his compliance, was unconstitutionally vague, he could not be guilty of

either the underlying grand larceny charge or the six counts of filing a false

instrument which were premised upon his violation of the Public Charge

Regulation.  *Rubin*, 271 A.D.2d at 759, 706 N.Y.S.2d at 226.  The Third

Department went on, however, to affirm Rubin's convictions on counts

eight and nine of the indictment.  *Rubin*, 271 A.D.2d at 759-60, 706

N.Y.S.2d at 226.

 After granting the People's application for leave to appeal the

decision of the Appellate Division, *People v. Rubin*, 95 N.Y.2d 857, 714

N.Y.S.2d 8 (2000), the New York Court of Appeals issued a decision

holding that the Public Charge Regulation was not unconstitutionally

vague as applied to Rubin, and consequently modifying the Appellate

Division's order by reinstating Rubin's convictions on counts one through seven and remitting the case back to the Third Department for consideration by that court of the remaining issues raised by appellant in his direct appeal. *People v. Rubin*, 96 N.Y.2d at 552, 731 N.Y.S.2d 548, 908, 910 (2001). On remittur, the Third Department affirmed Rubin's convictions on all counts, *People v. Rubin*, 286 A.D.2d 555, 729 N.Y.S.2d 561 (3d Dept. 2001), following which the Court of Appeals denied Rubin's application for leave to appeal. *People v. Rubin*, 97 N.Y.2d 733, 740 N.Y.S.2d 706 (2002).

      B.    <u>Proceedings in This Court</u>

Petitioner, represented by counsel, commenced this proceeding on May 10, 2002, *see* Petition (Dkt. No. 1), later filing a comprehensive memorandum of law in support of his petition. *See* Supporting Mem. (Dkt. No. 8). Following the issuance of an order by this court permitting the filing of the petition and directing a response (Dkt. No. 3), the Office of the Attorney General for the State of New York, acting on respondent's behalf, filed a memorandum in opposition to the petition, and has provided the court with some of the records associated with the relevant state court proceedings. Dkt. No. 16 ("Opposition Mem."). With the court's

permission, a reply memorandum, or "traverse" in further support of his

petition was filed by Rubin.[15]  Dkt. No. 19.

　　　Rubin's petition, which is now ripe for determination, has been

referred to me for the issuance of a report and recommendation pursuant

to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule

72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.　DISCUSSION

　　　A.　Release from Prison

　　　According to publicly available records maintained by the New York

Department of Correctional Services ("DOCS"), subsequent to the filing of

his petition Rubin was released from prison on parole.[16]  I therefore

consider whether this action has been rendered moot by Rubin's release.[17]

---

　　　[15]　Unfortunately, although both the petitioner and respondent cite to a document they have labeled "record" in their respective memoranda, this court has never been provided with a copy of that "record".  As a result, the majority of citations to the record provided by both the petitioner and the respondent in their briefs do not correspond to the state court record actually provided to the court. Several requests by the court to the Attorney General's office, which is charged with providing the court with the state court record (*see* Rule 5 of the Rules Governing Section 2254 Cases), for a copy of the "record" cited by the parties have proven fruitless.

　　　[16]　*See* http://nysdocslookup.docs.state.ny.us/GCA00P00/WIQ3/WINQ130.

　　　[17]　Although the respondent has not argued that Rubin's petition has been rendered moot by virtue of his release, Article III, Section 2 of the United States Constitution limits the subject matter of the federal courts to cases that

18

28 U.S.C. § 2254 does not require that a petitioner be physically confined in order for a federal district court to retain jurisdiction to act upon his or petition for habeas relief.  *See Maleng v. Cook,* 490 U.S. 488, 491, 109 S.Ct. 1923, 1925 (1989).  Thus, for example, a petitioner who has been released from custody after filing his or her petition satisfies the "in custody" requirement of § 2254 if he or she remains subject to adverse collateral consequences which result from the subject conviction.  *See Carafas v. LaVallee*, 391 U.S. 234, 237-39, 88 S.Ct. 1556, 1559-60 (1968).

In this case, Rubin's petition does not appear to have been rendered moot by his release from prison; his habeas application was filed while he was in custody, and the collateral consequences which still exist as a result of his felony conviction preclude a finding that this matter is moot.[18]

*Spencer*, 523 U.S. at 12, 118 S.Ct. at 985 ("it is an 'obvious fact of life that

---

present a "case or controversy."  *Spencer v. Kemna*, 523 U.S. 1, 7, 118 S.Ct. 978, 983 (1998); *Baur v. Veneman*, 352 F.3d 625, 631-32 (2d Cir. 2003); *Greif v. Wilson, Elser, Moskowitz, Edelman & Dicker LLP*, 258 F.Supp.2d 157, 160 (E.D.N.Y. 2003). I therefore consider this issue *sua sponte*, since "[w]hether a federal court has subject matter jurisdiction is a question that 'may be raised at any time ... by the court *sua sponte*.'" *McGinty v. New York*, 251 F.3d 84, 90 (2d Cir. 2001) (quoting *Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 700 (2d Cir. 2000)).

[18]      Examples of such collateral consequences include the inability to serve as a juror, engage in certain businesses, or vote.  *Johnson v. Levine*, 00Civ.8402, 2001 WL 282719, at *1 (S.D.N.Y. Mar. 21, 2001).

most criminal convictions do in fact entail adverse collateral legal

consequences'") (quoting *Sibron v. New York*, 392 U.S. 40, 55, 88 S.Ct.

1889, 1898 (1968)); *see also Binder v. Szostak*, No. 96-CV-0640, 1997

WL 176353 (N.D.N.Y. Apr. 11, 1997) (Pooler, D.J.) (adopting Report-

Recommendation of Magistrate Judge Gustave J. DiBianco) (citations

omitted).  I therefore choose not to recommend the dismissal of Rubin's

petition on the basis of either mootness or lack of jurisdiction,

notwithstanding his release from prison.[19]

    B.   Standard of Review

Enactment of the Antiterrorism and Effective Death Penalty Act of

1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), brought

about significant new limitations upon the power of a federal court to grant

habeas relief to a state prisoner under 28 U.S.C. § 2254.  A federal court

cannot grant habeas relief to a state prisoner on a claim

> that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim –
>
> 1) resulted in a decision that was

---

[19]    In addition to requesting that this court overturn his state court
conviction, Rubin has sought interim relief including the entry of a stay of the state
court judgment and the granting of bail.  In light of his release from prison, Rubin's
request for such relief will be denied as moot. *E.g., United States V. Arraiza Navas,*
185 F. Supp.2d 123, 124 n.1 (D. Puerto Rico 2001).

> contrary to, or involved an
> unreasonable application of, clearly
> established Federal law, as determined
> by the Supreme Court of the United
> States; or
>
> 2) resulted in a decision that was based
> on an unreasonable determination of
> the facts in light of the evidence
> presented in the State court
> proceeding.

28 U.S.C. § 2254(d); *see also DeBerry v. Portuondo*, 403 F.3d 57, 66 (2d

Cir. 2005); *Miranda v. Bennett,* 322 F.3d 171, 177-78 (2d Cir. 2003);

*Boyette v. LeFevre*, 246 F.3d 76, 88 (2d Cir. 2001).  The AEDPA also

requires that in any such proceeding "a determination of a factual issue

made by a State court shall be presumed to be correct [and t]he applicant

shall have the burden of rebutting the presumption of correctness by clear

and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also DeBerry*, 403

F.3d at 66; *Boyette*, 246 F.3d at 88 (quoting § 2254(e)(1)) (internal

quotations omitted).

The Second Circuit has provided additional guidance concerning

application of this test, noting that

> [u]nder AEDPA, we ask three questions to
> determine whether a federal court can grant
> habeas relief: 1) Was the principle of Supreme
> Court case law relied upon in the habeas petition

> "clearly established" when the state court ruled? 2)
> If so, was the state court's decision "contrary to"
> that established Supreme Court precedent? 3) If
> not, did the state court's decision constitute an
> "unreasonable application" of that principle?

*Williams v. Artuz*, 237 F.3d 147, 152 (2d Cir. 2001) (citing *Williams and Francis S. v. Stone*, 221 F.3d 100, 108-09 (2d Cir. 2000)).

Because the AEDPA's restriction on federal habeas power was premised in no small part upon the duty of state courts to uphold the Constitution and faithfully apply federal laws, the AEDPA's exacting review standards apply only to federal claims which have been actually adjudicated on the merits in the state court. *Washington v. Shriver*, 255 F.3d 45, 52-55 (2d Cir. 2001). Accordingly, deference is not mandated under section 2254(d) if a state court decides the case on a procedural basis, rather than on the merits. *See Sellan v. Kuhlman*, 261 F.3d 303, 309-10 (2d Cir. 2001).

In *Sellan*, the Second Circuit answered the question of whether deference under section 2254(d) is not mandated if a state court decides a case without citing to federal law or otherwise making reference to a federal constitutional claim. Specifically, that court held that deference is required if the federal claim was presented to the state court and there

22

was an adjudication on the merits, even though the state court's decision

lacks explicit reference to the federal claim or to federal case law.  *Sellan*,

261 F.3d at 311-12.  As the Second Circuit explained, the plain meaning

of § 2254(d)(1) dictates our holding

> For the purposes of AEDPA deference, a state
> court "adjudicate[s]" a state prisoner's federal claim
> on the merits when it (1) disposes of the claim "on
> the merits," and (2) reduces its disposition to
> judgment.  When a state court does so, a federal
> habeas court must defer in the manner prescribed
> by 28 U.S.C. § 2254(d)(1) to the state court's
> decision on the federal claim – *even if the state
> court does not explicitly refer to either the federal
> claim or to relevant federal case law.*"

*Sellan*, 261 F.3d at 312 (emphasis added), *see also Ryan v. Miller*, 303

F.3d 231, 246 (2d Cir. 2002).[20]

When a state court's decision is found to be decided "on the merits",

that decision is "contrary to" established Supreme Court precedent if it

applies a rule that contradicts Supreme Court precedent, or decides a

case differently than the Supreme Court on a set of materially

---

[20]    In his opinion in *Sellan*, Chief Judge Walker acknowledged that
enlightenment in state court decisions as to the manner of disposition of federal
claims presented would greatly enhance a federal court's ability, on petition for
habeas review, to apply the AEDPA's deference standard.  *Sellan*, 261 F.3d at 312.
He noted, however, that a state court's failure to provide such useful guidance does
not obviate a federal court's duty to make the analysis and pay appropriate
deference if the federal claim was adjudicated on the merits, albeit tacitly so.  *Id.*

indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-06, 120

S.Ct. 1495, 1523 (2000).  Moreover, a federal court engaged in habeas

review must also determine not whether the state court's determination

was merely incorrect or erroneous, but instead whether it was "objectively

unreasonable".  *Williams*, 529 U.S. at 409, 120 S.Ct. at 1521; *see also*

*Sellan*, 261 F.3d at 315.  The Second Circuit has noted that this inquiry

admits of "[s]ome increment of incorrectness beyond error", though "the

increment need not be great[.]"  *Francis S.*, 221 F.3d at 111.

> C.   Substance of Petition

>> 1.   Ground One

In his initial ground for relief, petitioner argues that the Public Charge

Regulation – the lynchpin of his convictions on counts two through seven

of the indictment as well as the prosecution's theory regarding the larceny

charge set forth in the first count – is unconstitutionally vague, both on its

face and as applied to his circumstances.  Petition (Dkt. No. 1) at 6.

Petitioner therefore seeks an order vacating his conviction on the first

seven counts in the indictment due to the constitutional infirmity of the

Public Charge Regulation.  *Id.*

>>> i.   Clearly Established Supreme Court Precedent

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858 (1983).  Absent the implication of First Amendment interests, however, constitutional challenges to statutes on vagueness grounds must show that the statute is unconstitutionally vague as applied to the facts of the particular case under review.  *Chapman v. United States*, 500 U.S. 453, 467, 111 S.Ct. 1919, 1929 (1991).   As the Supreme Court has held, "it is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Powell*, 423 U.S. 87, 92, 96 S.Ct. 316, 319 (1975) (citing *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 714 (1975)); *see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc*., 455 U.S. 489, 495, 102 S.Ct. 1186, 1191 (1982) ("A court should ... examine the complainant's conduct before analyzing other hypothetical applications of the law"); *Broadrick v. Oklahoma*, 413 U.S. 601, 610, 93 S.Ct. 2908, 2915 (1973) ("[e]mbedded in the traditional rules

governing constitutional adjudication is the principle that a person to whom

a statute may constitutionally be applied will not be heard to challenge that

statute on the ground that it may conceivably be applied unconstitutionally

to others, in other situations not before the Court").

    ii.    <u>Contrary to, or Unreasonable Application of, Supreme
Court Precedent</u>

In rejecting Rubin's challenge to his convictions on counts one

through seven based upon the alleged constitutional infirmity of the Public

Charge Regulation, the Court of Appeals held:

> As applied to defendant, it is clear that the public
> charge regulation is not vague.  There was
> evidence at trial that defendant understood the
> public charge regulation and yet created schemes
> to conceal his violation of it.  Defendant, for
> example, promulgated two separate price
> schedules, one that was accurate and the other,
> kept hidden, that was designed and used to
> defraud Medicaid....  The People also adduced at
> trial that defendant had received letters from the
> Department of Social Services explaining that the
> public charge regulation restricted Medicaid
> payment for personal care services to the rate
> charged the general public.  Defendant understood
> the regulation to mean that the private-pay rate had
> to be higher than that paid by Medicaid, and that
> he had developed a fictitious private-pay rate
> schedule of $15.25 per hour which no member of
> the general public was asked to pay.  Despite
> these and other infractions each year from 1995
> through 1997, defendant attested that he

> understood the regulations and that his health care
> facility complied with applicable State regulations.
> The public charge provision is, thus, not
> impermissibly vague as applied to defendant.

*Rubin*, 96 N.Y.2d at 551-52, 731 N.Y.S.2d 909-10.  I must therefore determine whether this ruling is either contrary to, or represents an unreasonable application of, the above-referenced Supreme Court precedent.[21]

### a.   Facial Validity of Public Charge Regulation

Rubin has never alleged, in either the state courts or his petition in this matter, that the two penal statutes forming the basis of his grand larceny and false instrument filing convictions are unconstitutionally vague. He does, however, challenge the regulation upon which those convictions hinge.  Where the violation of a regulation forms the basis of a prosecution under a separate criminal statute, courts may properly review the validity of that regulation to ensure constitutional soundness of the related criminal conviction.  *See*, *e.g.*, *Reno v. Flores*, 507 U.S. 292, 300-01, 113 S.Ct.

---

[21]   Although, subsequent to the Court of Appeal's decision, the Third Department affirmed Rubin's conviction and sentence, that latter opinion of the Appellate Division did not address the constitutionality of the Public Charge Regulation.  Accordingly, the Court of Appeals was the last state court to pass judgment regarding the issue of the constitutionality of the Public Charge Regulation.

1439, 1446-47 (1993) ("To prevail in ... a facial challenge, respondents

"must establish that no set of circumstances exists under which the

[regulation] would be valid") (alteration in original) (citation omitted).

Petitioner initially faults the New York Court of Appeals for failing to

consider his facial challenge to the Public Charge Regulation.  *See*

Supporting Mem. (Dkt. No. 8) at 13.  Specifically, Rubin argues that facial

review of the Public Charge Regulation was required because that

regulation 1) fails to describe with sufficient particularity what a party

subject to the provision must do in order to comply with its requirements;

2) is "so wanting in specification of standards that persons of common

intelligence must necessarily guess at its meaning"; and 3) has directly

impacted his liberty.  *See* Supporting Mem. (Dkt. No. 8) at 16-20.

In *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003), *cert.*

*denied*, ___ U.S. ___, 125 S.Ct. 32 (2004), the Second Circuit observed

that, in considering a challenge to a statute's facial validity brought by

individuals convicted of criminal conduct,

> [p]anel opinions of this Court have repeatedly held
> that when, as in the case before us, the
> interpretation of a statute does not implicate First
> Amendment rights, it is assessed for vagueness
> only "as applied," i.e., "in light of the specific facts
> of the case at hand and not with regard to the

28

> statute's facial validity."  *United States v. Nadi*, 996
> F.2d 548, 550 (2d Cir.), *cert. denied*, 510 U.S. 933,
> 114 S.Ct. 347 (1993).  "[O]ne whose conduct is
> clearly proscribed by the statute cannot
> successfully challenge it for vagueness."  *Id.*;
> *accord* [*United States v.* ]*Rybicki*, 287 F.3d [257,]
> 263 [(2d Cir. 2002) ("Where there is a vagueness
> challenge to a statute that does not involve First
> Amendment freedoms, the statute must be
> evaluated on an 'as applied' basis.").
>
> * * * * *
>
> The Court [again discussed] this standard in *United
> States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095
> (1987), noting ...[t]he fact that [a] [statute] might
> operate unconstitutionally under some conceivable
> set of circumstances is insufficient to render it
> wholly invalid, since [the Court] has not recognized
> an "overbreadth" doctrine outside the limited
> context of the First Amendment.  *Id.* at 745, 107
> S.Ct. 2095.  In other words, where First
> Amendment overbreadth analysis is not available,
> a statute will be held unconstitutionally vague "on
> its face" only if it is unconstitutionally vague "as
> applied" to all circumstances.

*Rybicki*, 354 F.3d at 129-31 (footnote omitted); *United States v.*

*Venturella,* 391 F.3d 120, 133-34 (2d Cir. 2004); *see also United States v.*

*Whittaker*, 999 F.2d 38, 42 (2d Cir. 1993) ("Other than in the First

Amendment context, vagueness challenges also must be examined in

light of the facts of the case, on an as-applied basis") (internal quotation

and citation omitted); *Yaman v. D'Angelo,* No. 01-CV-6543 (CJS), 2005

WL 3200213 at *8 (W.D.N.Y. Nov. 28, 2005).

Although the *Rybicki* court noted that in *City of Chicago v. Morales*, 527 U.S. 41, 119 S.Ct. 1849 (1999), a plurality of Supreme Court Justices intimated that courts could properly consider facial challenges to a statute without first considering whether the law was unconstitutionally vague as applied to the facts of the case, it specifically observed that "[t]he approach of the *Morales* plurality has not been adopted by the Supreme Court as a whole."  *Rybicki*, 354 F.3d at 131 (citing *Lerman v. Bd. of Elections of New York*, 232 F.3d 135, 144 n. 10 (2d Cir. 2000)). Accordingly, *Rybicki* makes clear that there is no clearly established federal law, as determined by the Supreme Court, which holds that courts are required to consider a facial challenge regarding the constitutionality of a regulation that does not implicate First Amendment concerns where such regulation is valid as-applied to the party alleged to be aggrieved. Since New York's Court of Appeals determined that the Public Charge Regulation was valid as applied to Rubin, I cannot conclude that the failure of that court to consider his facial challenge to the Public Charge Regulation was either contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.  *E.g. Smith v. Barkley*, No. 9:99-CV-0257, 2004 WL 437470, *6 (N.D.N.Y. Feb.

14, 2004) (Sharpe, J.) ("[s]ince no clearly established Supreme Court precedent required [the jury instruction requested by petitioner, he] is unable to establish that the Third Department's decision denying this aspect of his appeal was contrary to, or an unreasonable application of, clearly established Supreme Court precedent") (citation omitted); *House v. Miller*, No. 02-CV-5379, 2003 WL 23198788, at *17 (E.D.N.Y. Oct. 27, 2003).  I therefore recommend that Rubin's request for habeas relief based upon this theory be denied.

b.    As-Applied Challenge to Constitutionality of the Public Charge Regulation

Petitioner additionally argues that the Public Charge Regulation is unconstitutionally vague as applied to his circumstances.  Supporting Mem. (Dkt. No. 8) at 26-30.  In support of this contention, petitioner contends that unlike 18 N.Y.C.R.R. § 515.2(b)(1)(i)(d), which prohibits Medicaid providers from seeking payment from the DSS for an amount "*substantially* in excess of the customary charges or costs to the general public" (emphasis added), the Public Charge Regulation does not prohibit any conduct by health care providers and is  "emphatically vague, devoid of any pretense of reasonable notice, and reflective of arbitrary prosecutorial discretion."  Supporting Mem. (Dkt. No. 8) at 27.  Petitioner

31

also maintains that 1) unwritten exceptions to the Public Charge

Regulation, acknowledged by prosecution witnesses, establish the

vagueness of that regulation as applied to him; 2) the terms "charge" and

"general public" within the Public Charge Regulation are impermissibly

vague; and 3) the prosecution failed to prove that he intended to violate

that regulation.  Supporting Mem. (Dkt. No. 8) at 27-30.

Considering first Rubin's argument that the terms "charge" and

"general public", as used in the Public Charge Regulation, are

unconstitutionally vague, I adopt the findings of the New York Court of

Appeals in *Ulster Home Care, Inc.* when addressing a similar challenge to

this language in that regulation, the court noting that

> [n]either the term "general public" nor "rate" as
> used in the regulation is so vague that it could not
> be understood by a person of ordinary intelligence
> or could be arbitrarily enforced.  The challenged
> language has a common understanding and is
> used in other State Medicaid and Medicare
> regulations.  The limited application of this
> regulation to home personal care providers who
> elect to enroll in the Medicaid program and who
> expressly agree to adhere to its rules, coupled with
> the ample opportunity these providers had to
> understand the requirements of the Medicaid
> program, are further reasons to reject the argument
> that the public charge provision is impermissibly
> vague.

*Ulster Home Care, Inc.*, 96 N.Y.2d at 510, 731 N.Y.S.2d at 913; *see*, *e.g.*, *Heter v. United States*, No. 86 CIV. 5154, 1987 WL 19293, at *2 (S.D.N.Y. Oct. 26, 1987) (rejecting vagueness claim where "person of ordinary common sense could understand the conduct that is prohibited or subject to penalty") (citation omitted); *United States v. Genovese,* No. 05-CR-04, 2005 WL 1439860, at *2-5 (S.D.N.Y. June 21, 2005) (rejecting vagueness challenge where "ordinary person in [defendant's] position could understand that [the conduct in which he had engaged] was prohibited by law").

    The record establishes that Rubin never signaled to the DSS any confusion on his part as what was meant by the terms "rate" or "general public" in the Cost Reports filed with the agency on behalf of Allstate. Those reports specifically asked Rubin to provide  the rate "charge[d] to the general public" for the services provided by Allstate for its services. *See* RA 2319, 2339, 2373 and 2391.  Nowhere on any of these cost reports, the truth and correctness of which he certified, did Rubin indicate any ambiguity as to what the terms "rate" or "general public" meant to him. Rather, petitioner simply listed the "non-discounted" rate in those reports when providing information about Allstate's charge to the general public,

despite knowing that with isolated exceptions no Allstate private payer was ever charged that rate. TT 733-34.

The record also reflects that petitioner himself handwrote explanations of items included by him on those reports in instances where he believed an item on the report needed clarification.  On the 1994 cost report filed with the DSS, for example, in an apparent attempt to clarify a non-personnel expense of Allstate included in that report Rubin placed an asterisk next to a figure reflecting the company's operating expenses, and handwrote an explanation relating to that expense.  RA 2379.  Moreover, Rubin's personal experience in the field of providing home health services to Medicaid patients, as well as acts purposefully undertaken by him in direct contravention of the Public Charge Regulation, including his company's use of two different rate sheets reflecting Allstate's alleged charges for Level II care – one of which was solely to be used "for Medicaid", TT 1363-65 – further belie any claim that the meaning of the terms "charge" and "general public" was unclear to him.

It is true, as petitioner argues, that prosecution witnesses testified to Rubin's belief he could charge "discounted" rates for individuals who paid their bills more promptly than the state, or for entities such as unions or

34

insurance companies for which pre-existing contracts for services were in effect.  Supporting Mem. (Dkt. No. 8) at 28.  In making that claim, however, Rubin fails to explain the basis for his conscious decision to refrain from disclosing to the DSS the existence of the "discounted" rate sheet created by Allstate and exclusively used by the company to determine the rate to be charged to private paying clients.[22]

Petitioner further maintains that the Public Charge Regulation does not reveal any prohibitions, characterizing it instead as a mere passive announcement of how the DSS calculates Medicaid payments to providers like Allstate.  A fair reading of that regulation, however, reveals that it does in fact proscribe certain conduct, when considered together with other, appropriate provisions.

Title 18 N.Y.C.R.R. § 515.2(b), which describes unacceptable practices, prohibits the filing of claims for . . . "an amount in excess of establishes rates or fees; . . ." 18 N.Y.C.R.R. § 505.14(h)(7)(ii)(a)(1), in turn, defines the rate to be charged by providers like Allstate, and specifically requires that such rates be set at the lower of that charged to

_____

[22]     I note that none of the prosecution witnesses testified that a provider could *properly* charge Medicaid rates higher than those applicable to the general public.

members of the general public for similar services, or the rate determined

by the DSS, in essence thereby affixing those rates at an amount no

higher than the provider charges the general public for personal care

services.  *See* 18 N.Y.C.R.R. §505.14(h)(7)(ii)(a)(1).

Petitioner faults the prosecution for ultimately pursuing the false

instrument charges based solely upon its theory that Rubin had violated

the Public Charge Regulation, rather than relying upon 18 N.Y.C.R.R. §

515.2(b)(1)(i)(d), which specifically prohibits submission of claims for

"amounts substantially in excess of the customary charges or costs to the

general public."  This regulation, which must be read in tandem with, and

in the context of, section 505.14(h)(7)(ii)(a)(1), was clearly intended as a

catchall provision to prevent gauging where in instances where there is no

specific controlling limitation such as that provided under section

505.14(h)(7)(ii)(a)(1).

Simply stated, when the regulations are read in context they provide

ample notice of prohibited conduct and support the overwhelming

evidence in the record that Rubin was well aware of those requirements

and the applicable limitations.  In that regard, the evidence at trial

convincingly established that Rubin was aware that a New York State

36

regulation prohibited Allstate from charging Medicaid a rate higher than was charged to the general public for similar services, but nevertheless took affirmative steps to intentionally violate that regulation.  Fernandes testified, for example, that at Rubin's direction she used two different rate sheets when providing information regarding Allstate charges to the general public – one which was sent to potential clients, and the other which contained a higher hourly rate for Level II services which, in accordance with Rubin's instructions, was only to be used "for Medicaid".[23] TT 1360-64.  Additionally, in December 1994 and again in December 1995, Rubin received letters from the DSS directing him to provide the agency with Allstate's "private fee schedule" for the years 1995 and 1996 respectively, and which prominently stating that "Medicaid regulations preclude payment in excess of the charge made to the general public for personal care services."  RA 2446-47, TT 492-93.  Despite all of this, Rubin continued to overcharge the DSS until his company was ultimately audited by the Attorney General's Medicaid Fraud Control Unit.

_____

[23]     By way of illustration, in 1995 the rate sheet that was distributed to potential clients with brochures regarding the services provided by Allstate listed the hourly rates of that company for personal care services as being $12.00, while a second rate sheet – which was not sent out to the general public – indicated that the hourly rate charged by Allstate for home care was $15.25.  TT 1362-64; *see also* RA 2455-56.

To succeed on his as-applied vagueness challenge regarding the Public Charge Regulation, Rubin must show that as applied to his case, the regulation "was so vague and uncertain that he was not presented with an ascertainable standard of guilt." *United States v. Irwin*, 354 F.2d 192, 196 (2d Cir. 1965), *cert. denied*, 383 U.S. 967, 86 S.Ct. 1272 (1966) (citation and internal quotation omitted).  Such vagueness challenges must be viewed in light of the facts of the case at hand.  *See Mazurie*, 419 U.S. at 550, 95 S.Ct. at 714 (vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand); *United States v. Powell*, 423 U.S. 87, 92, 96 S.Ct. 316, 319 (1975) (same) (citing *Mazurie*); *Ventruella,* 391 F.3d at 134 (*citing Rybicki).*

After carefully considering this claim,  I find the New York State Court of Appeals' decision denying Rubin's as-applied challenge to the Public Charge Regulation to be consistent with relevant Supreme Court precedent.  I further find the failure of the New York State Court of Appeals to consider petitioner's facial challenge to the Public Charge Regulation to be neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.  Accordingly, I recommend

38

that Rubin's first ground for relief be denied.

>       2.      Ground Two

In his second claim, petitioner argues that insufficient evidence was adduced at trial to establish his guilt the crimes charged in counts one through seven of indictment.  Petition (Dkt. No. 1) at 6.  Rubin argues that lacking at trial was any proof establishing he knew he was violating the Public Charge Regulation, and that he knowingly made false statements when submitting the Provider Transmittal Certifications to the DSS.  *Id.* at 6-7.  Petitioner also argues that because the Public Charge Regulation purportedly does not proscribe any behavior, and the Provider Transmittal Certifications completed by him do not "elicit any response that relates to compliance with the public charge regulation", his conviction on those counts must be vacated.  *Id.* at 7.  Petitioner asserts that for these reasons, his convictions on counts two through seven of the indictment cannot withstand habeas scrutiny and, because it is in essence intertwined with those counts, his grand larceny conviction in connection with count one of the indictment must also fall.

In its decision following remittur, the Third Department addressed these arguments.  That court concluded that the convictions on counts two

through seven of the indictment, for the filing of false instruments, were supported by legally sufficient evidence, and that because petitioner filed for Medicaid reimbursement rates above those charged to the general public, knowing that he was not entitled by regulation to recover such amounts, the evidence established that he additionally committed grand larceny as charged in count one. These findings are therefore entitled to deference under the AEDPA.[24]

### i.   Clearly Established Supreme Court Precedent

The Due Process Clause of the United States Constitution protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he or she is charged. *See Jackson v. Virginia*, 443 U.S. 307, 315, 99 S.Ct. 2781, 2787 (1979); *Fiore v. White*, 531 U.S. 225, 228-29, 121 S.Ct. 712, 714 (2001). In deciding a challenge to the sufficiency of evidence presented at trial, federal courts are to determine "whether the evidence adduced at trial could support any rational determination of guilty

---

[24]     As will be seen, in its second decision in the matter the Third Department also noted that insofar as Rubin's sufficiency of evidence argument was premised upon the lack of critical, certifying verbage in the documents forming the basis for counts two and three, the argument was not raised at trial, and was thus unpreserved for appeal purposes. *Rubin,* 286 A.D.2d at 556, 779 N.Y.S.2d at 562.

beyond a reasonable doubt." *United States v. Powell*, 469 U.S. 57, 67, 105 S.Ct. 471, 478 (1984) (citing *Jackson*) (other citations omitted).

> ii.   Contrary To, or Unreasonable Application of, Supreme Court Precedent

A federal court sitting in habeas review must look to state law to ascertain the elements of the crime of which the petitioner stands convicted in considering whether there was sufficient evidence adduced at trial to support a jury's determination of his or her guilt.  *See Fama v. Commissioner of Correctional Services*, 235 F.3d 804, 811 (2d Cir. 2000) (citing *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999), *cert. denied*, 528 U.S. 1170, 120 S.Ct. 1196 (2000)); *Carter v. Greiner*, No. 02 CV 2797, 2004 WL 733422, at *4 (E.D.N.Y. Apr. 6, 2004) (citing *Fama*).  I must therefore review New York's statutory requirements for the crimes of filing a false instrument in the first degree and second degree grand larceny in order to properly assess Rubin's challenge to the sufficiency of the evidence supporting his convictions.

> a.   Filing a False Instrument

In New York, a finding of guilt of offering a false instrument for filing in the first degree requires proof beyond a reasonable doubt that the defendant "knew that a written instrument contained false information, had

the intent to defraud the state and offered the instrument to a public office

with knowledge or belief that it would be filed." *People v. Hure*, 16 A.D. 3d

774, 775, 790 N.Y.S.2d 591, 592 (3d Dept. 2005) (citing N.Y. Penal L. §

175.35; *People v. Stumbrice,* 194 A.D.2d 931, 932, 599 N.Y.S.2d 325[,

326 (3d Dept.)], *lv. denied* 82 N.Y.2d 727, 602 N.Y.S.2d 824 (1993).  I

therefore consider whether the evidence adduced at trial could support

any rational determination of petitioner's guilt beyond a reasonable doubt

relating to his convictions on counts two through seven of the indictment.

### 1.    Counts Two and Three

Count two charged that Rubin, "knowing that a written instrument

contained a false statement and false information, and with the intent to

defraud the State of New York, offered and presented it to a public office

and public servant ...."  The written instrument underlying that charge

relates to a claim submitted by Rubin on or about May 6, 1994 on behalf of

Allstate regarding services provided to a Medicaid patient. *Id.*  That claim

was submitted by the petitioner on a Provider Transmittal Certification

bearing the date May 5, 1994.  *See* RA  2102.  Count three of the

indictment similarly charged petitioner with submitting a claim on or about

September 6, 1994 utilizing a Provider Transmittal Certification containing

false information, relating to a different Medicaid patient.  RA 2105.

Petitioner argues that his convictions on those two counts must be vacated because the Provider Transmittal Certifications upon which those convictions were based did not contain language in which Rubin expressly certified his compliance with any state regulation.  Supporting Mem. (Dkt. No. 8) at 34-35.  In opposing this aspect of the petition, respondent counters that petitioner is procedurally barred from obtaining the relief he now seeks in that portion of his petition.  Opposition Mem. (Dkt. No. 16) at 25-27.

In denying this aspect of Rubin's appeal, the Appellate Division noted that:

> this issue is not preserved for appellate review inasmuch as it was not raised at the time of trial. Moreover, the cited language was not an essential predicate to defendant's conviction of ... offering a false instrument for filing in the first degree.  If the jury concluded, as it undoubtedly did, that defendant submitted claims that were fraudulently inflated, the jury was justified in concluding that ... he offered the instrument knowing that it contained false information with intent to defraud (*see* Penal Law § 175.35).

*Rubin*, 286 A.D.2d at 556, 729 N.Y.S.2d 562-63.  Such a determination by a state court that a claim is unpreserved for appellate review constitutes a

finding of procedural default.[25]  *Betancourt v. Bennett*, No. 02-CV-3204,

2003 WL 23198756, at *12 (E.D.N.Y. Nov. 7, 2003); *Duren v. Bennett*, 275

F.Supp.2d 374, 380 (E.D.N.Y. 2003); *see also* New York Criminal

Procedure Law ("CPL") § 470.05.

Federal courts may only consider the substance of procedurally

defaulted claims where the petitioner can establish both cause for the

procedural default and resulting prejudice or, alternatively, that a

fundamental miscarriage of justice would occur absent federal court

review.  *Dixon v. Miller*, 293 F.3d 74, 80-81 (2d Cir.) (citing *Coleman v.*

*Thompson*, 501 U.S. 722, 111 S.Ct. 2546 (1991)), *cert. denied*, 537 U.S.

955, 123 S.Ct. 426 (2002); *St. Helen v. Senkowski*, 374 F.3d 181, 184 (2d

Cir. 2004) ("[i]n the case of procedural default ... [federal courts] may

reach the merits of the claim 'only if the defendant can first demonstrate

either cause and actual prejudice, or that he is actually innocent'") (quoting

*Bousley v. United States*, 523 U.S. 614, 622, 118 S.Ct. 1604, 1611

---

[25]     The fact that the Third Department went on to address the merits of
this aspect of Rubin's appeal does not alter this conclusion; "federal habeas review
is foreclosed when a state court has expressly relied on a procedural default as an
independent and adequate state ground, even where the state court has also ruled
in the alternative on the merits of the federal claim."  *Velasquez v. Leonardo*, 898
F.2d 7, 9 (2d Cir. 1990); *Broome v. Coughlin*, 871 F.Supp. 132, 134 (N.D.N.Y.
1994) (Kaplan, J., sitting by designation).

(1998)) (other citations omitted), *cert. denied sub nom.*, *St. Helen v. Miller*,

___ U.S. ___, 125 S.Ct. 871 (2005); *see generally Murray v. Carrier*, 477

U.S. 478, 495-96, 106 S.Ct. 2639, 2649-50 (1986).  A fundamental

miscarriage of justice, in turn, exists "where a constitutional violation has

probably resulted in the conviction of one who is actually innocent."

*Dixon*, 293 F.3d at 81.

To establish "cause," a petitioner must show that some objective

external factor impeded his or her ability to comply with the relevant

procedural rule.  *See Coleman*, 501 U.S. at 753, 111 S.Ct. at 2566-67;

*Restrepo v. Kelly*, 178 F.3d 634, 638 (2d Cir. 1999) (discussing cause in

context of petitioner's procedural default); *Doleo v. Reynolds*, No. 00

CIV.7927, 2002 WL 922260, at *3 (S.D.N.Y. May 7, 2002) (petitioner must

demonstrate cause for failure to exhaust claims).  Examples of external

factors include "interference by officials," ineffective assistance of counsel,

or that "the factual or legal basis for a claim was not reasonably available"

at trial or on direct appeal.  *Murray*, 477 U.S. at 488, 106 S.Ct. at 2645;

*Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994) (citing *Murray*); *United

States v. Helmsley*, 985 F.2d 1202, 1206 (2d Cir. 1992); *Lovacco v.

Stinson*, No. 97CV5307, 2004 WL 1373167, at *3 (E.D.N.Y. June 11,

2004) (citing *Murray*).[26]

Although petitioner now faults his trial counsel in an apparent effort to avoid the consequences of the procedural default finding and establish cause for his failure to timely present the claim, *see* Supporting Mem. (Dkt. No. 8) at 35, Rubin failed to argue in the state courts that his counsel rendered ineffective assistance by failing to raise this issue at trial. Indeed, the record establishes that the contention raised by Rubin in the state courts in support of his claim of having received constitutionally inadequate representation at trial concerned certain jury charges requested by defense counsel.  *See* Brief in Support of Appeal (11/11/99) at 59, 61.  It is well-established that "[a] petitioner may not bring an ineffective assistance claim as cause for a default when that ineffective assistance claim itself is procedurally barred."  *Reyes v. Keane*, 118 F.3d 136, 140 (2d Cir.1997); *see also Murray*, 477 U.S. at 489, 106 S.Ct. at 2646; *Zelaya v. Mantello*, 00CIV.0865, 2003 WL 22097510, at *5

---

[26]      It should be noted, however, "[a]ttorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error.'"  *Coleman*, 501 U.S. at 752-53, 111 S.Ct. at 2566) (quoting *Murray*, 477 U.S. at 488, 106 S.Ct. at 2645).

(S.D.N.Y. Sept. 10, 2003); *Santiago v. McGinnis*, CIV.00-5870, 2002 WL 31946709, at *4 (E.D.N.Y. Oct. 21, 2002); *Carey v. Supt.*, 99-CV-0821, slip op. at 5 (N.D.N.Y. Sept. 29, 2003) (McAvoy, S.J.) (citing *Murray*). Since Rubin has not established cause for his procedural default, this court need not decide whether he suffered prejudice, because a petitioner must establish *both* cause and prejudice in this context.[27]  *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985); *Miller v. Bennett*, No. 98-CV-0661, 2004 WL 1573874, at *10 (W.D.N.Y. May 22, 2004) ("[s]ince petitioner cannot show cause for his procedural default, this court need not reach the question of whether he can show prejudice") (citing *Stepney*); *Jones v. Barkley*, No. 99-CV-1344, 2004 WL 437468, at *9 (N.D.N.Y. Feb. 27, 2004) (Sharpe, D.J.) (collecting cases); *McLeod v. Moscicki*, No. 02 Civ. 9335, 2003 WL 22427757, at *8 (S.D.N.Y. Oct. 22, 2003) (Francis, M.J.); *Pou v. Keane*, 977 F.Supp. 577, 581 (N.D.N.Y. 1997) (Kahn, J.).

Notwithstanding my finding of no basis to excuse petitioner's failure to preserve the argument for review, I nonetheless recommend against reliance upon procedural default as a ground for declining to consider this

---

[27]     A petitioner bears the burden of demonstrating cause for his or her procedural default and resulting prejudice.  *See Simpson v. Portuondo*, 01CIV.8744, 2002 WL 31045862, at *5 (S.D.N.Y. June 4, 2002).

aspect of his habeas petition, based upon my finding that Rubin is actually

innocent of the charges contained in counts two and three of the

indictment.  The record suggests that throughout the course of Rubin's

trial the prosecutor believed that all of the Provider Transmittal

Certifications submitted by the petitioner on behalf of Allstate during the

years 1994 through 1996 contained identical "boilerplate" certification

language.[28]

---

[28]     Beginning in February, 1995, Provider Transmittal Certifications
submitted by health care service providers to DSS contained the following
language:

### PROVIDER TRANSMITTAL CERTIFICATION

I am (or the business entity named in this form of which I am a partner, officer or
director is) a qualified provider enrolled with and authorized to participate in the New
York State Medical Assistance Program and in the professions or specialties, if any
required in connection with this claim; the persons providing services, care and
supplies have the necessary licensing, certification, training and experience to
perform the claimed service: I have reviewed these claims: I (or the entity) have
furnished or caused to be furnished the care, services and supplies itemized and
done so in accordance with applicable federal and state laws and regulations: I have
read the Medicaid Management Information Systems Provider manual and all
revisions thereto; all claims are made in full compliance with the pertinent provisions
of the manual and revisions: all claims for care, services and supplies provided at the
order of another professional have to the best of my knowledge been ordered by that
professional in bona fide compliance with the procedures set forth in the manual and
revisions.  All care, services and supplies for which claim is made are medically
necessary for the treatment of the named recipient, the amounts listed are due and,
except as noted, no part thereof has been paid by, or to the best of my knowledge is
payable from any source other than the Medical Assistance Program; payment of
fees made in accordance with established Schedules is accepted as payment in full:
other than a claim rejected or denied or one for adjustment, no previous claim for the
care services and established schedules has been submitted or paid; ALL
STATEMENTS, DATA AND INFORMATION TRANSMITTED ARE TRUE,
ACCURATE AND COMPLETE TO THE BEST OF MY KNOWLEDGE; NO
MATERIAL FACT HAS BEEN OMITTED: I UNDERSTAND THAT PAYMENT AND
SATISFACTION OF THIS CLAIM WILL BE FROM FEDERAL, STATE AND LOCAL
PUBLIC FUNDS AND THAT I MAY BE PROSECUTED UNDER APPLICABLE
FEDERAL AND STATE LAWS FOR ANY FALSE CLAIMS, STATEMENTS OR
DOCUMENTS OR CONCEALMENT OF A MATERIAL FACT; taxes from which the
State is exempt are excluded; all records pertaining to the care services and supplies

*See* TT 370.  Consistent with this apparent, mistaken belief, the

prosecutor chose "one of these certifications" for the jury to view in

offering evidence of Rubin's guilt of the filing false instrument charges.  *Id.*

Thereafter, the prosecutor asked Joseph Guy, Director of New York's

Bureau of Medical Review and Payment of the DOH, whether health care

providers were required to certify to the DSS their compliance with state

regulations.  TT 370.  Guy confirmed that they were illustrating by reading

to the jury the following language – language which is *not* contained in the

May, 1994 or September, 1994 Provider Transmittal Certifications that

_____

provided including all records which are necessary to disclose fully the extent of care,
services and supplies provided to individuals under the New York State Medical
Assistance Program will be kept for a period of six years from the date of payment,
and such records and information regarding these claims and payment therefor shall
be promptly furnished upon request to the local or State Department of Social
Services, the State Medicaid Fraud Control Unit or the Secretary of the Department
of Health and Human Services: there has been compliance with the Federal Civil
Rights Act of 1964 and with section 504 of the Federal Rehabilitation Act of 1973, as
amended, which forbid discrimination on the basis of race, color, national origin,
handicap, age, sex and religion: I agree (or the entity agrees) to comply with the
requirements of 42 CFR Part 455 relating to disclosures by providers; the State of
New York through its fiscal agent or otherwise is hereby authorized to (1) make
administrative corrections to claims submitted under this agreement to enable its
automated processing, subject to reversal by provider, and (2) accept the claim
submitted under this agreement as original evidence of care, services and supplies
furnished.  In submitting claims under this agreement I understand and agree that I
(or the entity) shall be subject to and bound by all rules, regulations, policies,
standards, fee codes and procedures of the New York State Department of Social
Services as set forth in title 18 of the Official Compilation of Codes, Rules and
Regulations of New York State and other publications of the Department, including
Medicaid Management Information System Provider Manuals and other official
bulletins of the Department.  I understand and agree that I (or the entity) shall be
subject to and shall accept, subject to due process of law, any determinations
pursuant to said rules, regulations, policies, standards, fee codes and procedures,
including, but not limited to, any duly made determination effecting my (or the
entity's) past, present or future status in the Medicaid program and/or imposing any
duly considered sanction or penalty.

form the basis of Rubin's conviction on counts two and three of the indictment:

> I have reviewed these claims: I (or the entity) have furnished or caused to be furnished the care, services and supplies itemized and done so in accordance with applicable federal and state laws and regulations.

TT 370; *see*, *e.g.*, RA 2108.  When the prosecutor further asked Guy whether there was any additional language contained in those Provider Transmittal Certifications which advised the provider of the penalties for falsely declaring compliance with applicable regulations, Guy again responded in the affirmative, and read additional language contained on the Provider Transmittal Certification selected by the prosecution at trial as representative of that found in all Provider Transmittal Certification forms completed by Rubin, but which was also not contained in the May, 1994 or September, 1994 Provider Transmittal Certifications.  TT 371.

Careful review of the May, 1994 and September, 1994 Provider Transmittal Certifications submitted by Rubin reveals that the language contained in those certifications is materially different from that found within the Provider Transmittal Certification about which Guy testified when discussing the representations made by Rubin to the DSS.

Significantly, neither the May, 1994 nor the September, 1994 Provider

Transmittal Certifications contained *any* language certifying Rubin's

compliance with any federal, state or local laws or regulations.[29]

---

[29]     The "boilerplate" language on both the May, 1994 and September, 1994 Provider Transmittal Certifications contained the following language under the heading "Provider Transmittal Certification":

> PROVIDER CERTIFIES THAT: THE CARE, SERVICES AND SUPPLIES ITEMIZED HAVE BEEN FURNISHED, THE AMOUNTS LISTED ARE DUE AND, EXCEPT AS NOTED, NO PART THEREOF HAS BEEN PAID; THE CLAIMS SO RECORDED AND SUBMITTED AS INPUT DATA ACCURATELY REFLECT THE DATA SUPPLIED TO THE PROVIDER: THE PROVIDER WILL RETAIN AND PRESERVE, SUBMIT TO THE STATE OR ITS FISCAL AGENT OR MAKE AVAILABLE FOR AUDIT ALL ORIGINAL DOCUMENTS AS REQUIRED BY LAW. PROVIDER FURTHER CERTIFIES THAT: PAYMENT OF FEES MADE IN ACCORDANCE WITH ESTABLISHED SCHEDULES IS ACCEPTED AS PAYMENT IN FULL AND THERE HAS BEEN COMPLIANCE WITH TITLE VI OF THE FEDERAL CIVIL RIGHTS ACT OF 1964 WITHOUT DISCRIMINATION ON THE BASIS OF RACE, COLOR, OR NATIONAL ORIGIN; PROVIDER FURTHER UNDERSTANDS THAT PAYMENT AND SATISFACTION OF THIS CLAIM WILL BE FROM FEDERAL, STATE, AND LOCAL PUBLIC FUNDS AND THAT IT MAY BE PROSECUTED UNDER APPLICABLE FEDERAL AND STATE LAWS FOR ANY FALSE CLAIMS, STATEMENTS OR DOCUMENTS OR CONCEALMENT OF A MATERIAL FACT. PROVIDER HEREWITH AUTHORIZES THE STATE OF NEW YORK; THROUGH ITS FISCAL AGENT OR OTHERWISE, TO: (1) MAKE ADMINISTRATIVE CORRECTIONS ON SUBMITTED CLAIMS TO ENABLE THE AUTOMATED PROCESSING OF SAME; AND (2) ACCEPT AS ORIGINAL EVIDENCE OF SERVICES RENDERED, CLAIM DATE IN A FORM APPROPRIATE FOR AUTOMATED DATA PROCESSING.  IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE INPUT DATA. WHETHER CONTAINED ON MAGNETIC INPUT OR OTHERWISE, THE UNDERLYING SOURCE DOCUMENTS, WHETHER SET FORTH IN CLAIM FORMS OR OTHERWISE, REGARDLESS OF WHEN SUCH DOCUMENTS ARE SUBMITTED.  THE FISCAL AGENT SHALL RELY ON THE INPUT DATE (MAGNETIC INPUT, ETC.) AND BE UNDER NO DUTY TO RECONCILE DATA CONTAINED THEREIN WITH THE SOURCE DOCUMENTS. THE PROVIDER FURTHER AGREES TO INDEMNIFY AND HOLD HARMLESS THE STATE OF NEW YORK OR ITS FISCAL AGENT FROM ANY AND ALL CLAIMS OR LIABILITY (INCLUDING BUT NOT LIMITED TO CONSEQUENTIAL DAMAGES, REIMBURSEMENTS OF ERRONEOUS BILLINGS AND REIMBURSEMENTS OF ATTORNEY FEES) INCURRED AS A CONSEQUENCE OF ANY ERROR, OMISSION, DELETION OR ERRONEOUS INSERT CAUSED BY PROVIDER IN THE SUBMITTED INPUT DATA.  NEITHER THE STATE OF N.Y. NOR ITS FISCAL AGENT SHALL BE RESPONSIBLE FOR ANY INCORRECT OR DELAYED PAYMENT TO PROVIDER RESULTING FROM ANY SUCH ERROR, OMISSION, DELETION OR ERRONEOUS INPUT DATA CAUSED BY PROVIDER IN THE SUBMISSION OF MEDICAID CLAIMS, ANY INPUT DATA THAT DOES NOT MEET THE STANDARDS PRESCRIBED BY THE FISCAL AGENT SHALL BE

The confusion regarding the prosecution's mistaken assumption that all Provider Transmittal Certifications contained the same language was exacerbated by comments made in closing arguments.  Addressing the proof offered of petitioner's guilt of counts two through seven of the indictment, the prosecutor stated that he did not expect jurors to "read the fine print" of the Provider Transmittal Certifications, but instead (wrongfully) assured the jury that "[e]very one" of the Provider Transmittal Certifications submitted by Rubin contained language that the claims were in compliance with all applicable regulations.  TT 2032.

The potential injustice associated with those misleading statements was further compounded since at the beginning of its deliberations, the jury was not provided with any of the actual Provider Transmittal Certifications which formed the basis of Rubin's convictions on counts two and three.  In this regard, I note that the trial court instructed that requests by the jury to view any exhibits were to be made through jury foreperson. TT 2128.  The jury, however, never asked to view those crucial Provider Transmittal Certifications prior to arriving at its verdict.  *See* Trial Tr. at

---

RETURNED TO THE PROVIDER FOR CORRECTION AND RESUBMISSION, ALL AT PROVIDER'S COST.

*See* Record at 2102, 2105 (typeface in originals).

2181-84 (record of requests made by jury during and through the conclusion of deliberations).  Thus, far from being "overwhelming", *see* Opposition Mem. (Dkt. No. 16) at 27, the evidence chiefly relied upon by the jury in arriving at its decision concerning Rubin's guilt of counts two and three of the indictment consisted of the critically flawed testimony of Guy regarding the alleged content of the relevant Provider Transmittal Certifications.  *See* TT 370-72; *see also* TT 2129 (court's instruction to the jury that questions posed to witnesses and their answers constituted evidence to be considered by the jury).

A "miscarriage of justice" may be found "where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." *Dretke v. Haley*, 541 U.S. 386, 393, 124 S.Ct. 1847, 1852 (2004) (quoting *Murray*, 477 U.S. at 496, 106 S.Ct. 2678).  "To establish actual innocence ... a habeas petitioner must demonstrate, that 'in light of all the evidence,' 'it is more likely than not that no reasonable juror would have convicted him.' " *Bousley*, 523 U.S. at 623, 118 S.Ct. at 1611 (quoting *Schlup v. Delo*, 513 U.S. 298, 327-28, 115 S.Ct. 851 (1995)).

In the underlying criminal action, counts two and three of the

53

indictment charged Rubin with knowingly offering and presenting to a

public office and public servant a written instrument that contained a false

statement and false information with the intent to defraud the State of New

York.  The Provider Transmittal Certifications upon which Rubin's

prosecution on those two counts was based, however, did not contain the

language referenced in the indictment and cited by the prosecution, and

about which Guy testified at trial.  Nor does a fair reading of those two

Provider Transmittal Certifications reveal any false statements or false

information regarding Rubin's compliance with applicable state

regulations.  Based upon my determination that it is more likely than not

no reasonable juror would have voted to convict Rubin of those two

charges, had he or she been informed of the actual language contained in

the May, 1994 and September, 1994 Provider Transmittal Certifications, I

recommend that Rubin's federal habeas petition be granted as to his

convictions on counts two and three of the indictment.

### 2.    Counts Four Through Seven

Counts four through seven of the indictment also charge Rubin with

filing a false instrument in the first degree.  Those counts accuse Rubin of

knowingly submitting to a public servant a written instrument containing

54

false statement and false information based upon his filing four Provider

Transmittal Certifications in August, 1995, October, 1995, September,

1996 and October, 1996 with the Computer Sciences Corporation.  *See*

RA 2108, 2111, 2114 and 2117.  As with his claim relating to counts two

and three, Rubin contends that there was insufficient evidence adduced at

trial to establish his guilt of the false instrument charges contained in those

counts.  Petition (Dkt. No. 1) at 7; Supporting Mem. (Dkt. No. 8) at 34-35.

The Appellate Division denied Rubin's appellate challenge to the

sufficiency of evidence regarding these counts on the merits, concluding

that "there existed legally sufficient evidence to support [Rubin's conviction

on] ... offering a false instrument for filing."  *Rubin*, 286 A.D.2d at 556-57,

729 N.Y.S.2d at 563.  I must therefore determine whether that

determination is either contrary to, or represents an unreasonable

application of, *Jackson* and its progeny.

In sharp contrast to the language contained in their 1994

counterparts, the Provider Transmittal Certifications filed by petitioner in

1995 and 1996 that formed the basis of counts four through seven

contained explicit language addressing the issue of Rubin's compliance

with state regulations.  As was noted above, those latter certifications

stated, *inter alia*, that 1) Rubin had "reviewed the[] claims" for which the certification was being provided, and that the services had been furnished in accordance with applicable federal and state laws and regulations; and 2) he was subject to and bound by all rules, regulations, policies, standards, fee codes and procedures of the DSS as set forth in title 18 of New York's Codes, Rules and Regulations. *See* RA 2108, 2111, 2114 and 2117. I find that the language contained in these Provider Transmittal Certifications, coupled with the evidence previously discussed establishing Rubin's knowledge of the Public Charge Regulation and his efforts to avoid compliance with that regulation, amply support the Third Department's finding that there was sufficient evidence adduced at trial regarding Rubin's guilt of the charges contained in counts four through seven of the indictment. Petitioner has therefore not demonstrated that the Third Department's denial of this aspect of his appeal is either contrary to, or an unreasonable application of, the above-referenced Supreme Court precedent. I therefore recommend that the portion of Rubin's second ground that seeks reversal of his conviction on those counts based upon evidence insufficiency be denied.

b.   <u>Grand Larceny</u>

Count one of the indictment against him charged Rubin with second degree grand larceny conviction.   The petitioner also challenges the sufficiency of the evidence adduced at trial to support his conviction on this count.

In New York, a person is guilty of grand larceny in the second degree when he or she steals property, the value of which exceeds $50,000.  N.Y. Penal Law §155.40; *Strogov v. Attorney General of State of New York*, 191 F.3d 188, 189 (2d Cir. 1999), *cert. denied*, 530 U.S. 1264, 120 S.Ct. 2723 (2000).  A person may properly be found to "steal[] property and commit[] larceny" when he or she takes property "with intent to deprive another of property or to appropriate the same to himself or a third person."   N.Y. Penal Law § 155.05; *Strogov*, 191 F.3d at 189.  In order to meet the required threshold showing the accused has stolen in excess of $50,000, various sums stolen over a period of time may properly be aggregated.  *Strogov,* 191 F.3d at 189 (fraudulent Medicaid claims filed over three and one-half year period amounting to over $200,000 may be combined to meet monetary threshold).

In support of his challenge to the sufficiency of evidence supporting his grand larceny conviction, petitioner argues that because his

convictions on the second and third counts must be dismissed, the larceny conviction must likewise be overturned because "it cannot be said whether the jury's verdict on [count one] was based on the flawed year of certifications."  Supporting Mem. (Dkt. No. 8) at 34-35. While at first blush this argument is potentially appealing, it overlooks the fact that petitioner's convictions on the four false instrument charges related to certifications filed by the petitioner in 1995 and 1996 are being upheld as supported by the sufficient evidence.  The aggregate of the amount of overpayments reflected in those four certifications, when combined, far exceeds the required, $50,000 threshold.  *See* RA 2108, 2111, 2114 and 2117.  More fundamentally, the argument overlooks the state appellate courts' finding that petitioner applied for Medicaid reimbursement at rates known by him to be excessive, thus committing a larceny which is not dependent upon whether or not the instruments through which those reimbursements were sought contained directly false statements.  The Third Department's finding that "there existed legally sufficient evidence to support larceny by false pretense and offering a false instrument for filing" constitutes a reasonable application of *Jackson* and its progeny, and is entitled AEDPA deference.  I therefore recommend that this aspect Rubin's second ground

for relief be denied.

### 3.   Ground Three

The third ground in Rubin's petition challenges the sufficiency of the

evidence regarding his convictions on counts eight and nine in the

indictment, alleging the filing of false instruments based upon

misrepresentations made in cost reports filed with the state.  Petition (Dkt.

No. 1) at 7.  In support of this aspect of his petition, Rubin submits that his

conviction on these counts must be set aside, arguing that

> there is no dispute that the entries [on the
> documents supporting the conviction] were
> prepared by in-house and outside experts who
> were themselves unaware of any inaccuracies; ...
> there is no evidence that [Rubin] reviewed, much
> less corrected, the work of these experts; and there
> is no evidence of a financial motive to defraud
> given that Allstate [Home Care] did not stand to
> reap any financial benefit from the allegedly false
> disclosures.

Supporting Mem. (Dkt. No. 8) at 39.

### i.   Clearly Established Supreme Court Precedent

As with his challenges to the sufficiency of the evidence relating to

the first seven counts in the Indictment, petitioner's habeas claims

regarding his convictions on the eighth and ninth counts contained in that

accusatory instrument are governed by *Jackson* and its progeny.[30]

>    ii.   Contrary To, or Unreasonable Application of, Supreme
>          Court Precedent

>          a.   Count Eight

The eighth count in the indictment charged Rubin with offering and presenting to a public office and public servant a written instrument that he knew contained a false statement and false information, with the intent to defraud the State of New York.  Indictment, Count Eight.  That count stems from the filing of a Cost Report with the DSS on or about September 18, 1995, containing "general public rates" charged by Allstate in 1994 for Level II care known by Rubin to be false.  *Id.*

The 1994 Cost Report at issue asked petitioner to provide the rate charged by Allstate for Level II care provided by that company.  RA 2370-87.  On that report, Rubin responded that Allstate's "1994 charge to the General Public" for Level II care was $15.25.  RA 2373.  The testimony at trial, however, established that during 1994, Rubin knew that the general public only paid $12.00 per hour for Level II services provided by Allstate.  TT 724-34, 1426. Thus, it is clear that the information contained on the

---

[30]     The governing, clearly-established Supreme Court precedent addressing this issue was summarized earlier in this opinion.  *See* pp. 40 - 41, *ante.*

1994 Cost Report, which made no mention of the $12.00 hourly

"discounted rate" actually charged to virtually all members of the general

public, contained false information.

I note also that immediately above Rubin's signature, as President of

Allstate, on the 1994 Cost Report was the following language:

<u>CERTIFICATION STATEMENT</u>

THE FOLLOWING STATEMENT MUST BE READ AND A
CERTIFICATION OF SUCH BE SIGNED BY THE OPERATOR
OR ADMINISTRATOR OF THE PERSONAL CARE
SERVICES AGENCY.  PLEASE ENTER ONLY ONE
SIGNATURE.

MISREPRESENTATION OR FALSIFICATION OF ANY
INFORMATION CONTAINED ON THIS FORM MAY BE
PUNISHABLE BY FINE AND/OR IMPRISONMENT UNDER
NEW YORK STATE LAW

<u>CERTIFICATION OF OPERATOR (PROPRIETARY AGENCIES)</u>
<u>             OR             </u>
<u>          CHIEF ADMINISTRATIVE OFFICER          </u>

I HEREBY CERTIFY THAT I HAVE READ THE
ABOVE STATEMENT AND THAT THE
INFORMATION FURNISHED IN THIS REPORT IS
IN ACCORDANCE WITH THE INSTRUCTIONS
AND IS TRUE AND ACCURATE TO THE BEST
OF MY KNOWLEDGE.

*See* RA 2385 (typeface as in original).

Since the jury could have rationally concluded that Rubin had both

61

read and (improperly) attested to the veracity of the information contained in the 1994 Cost Report based upon his certification of that document's accuracy, I find that ample evidence was presented at trial to support petitioner's conviction of the charge alleged in the eighth count in the indictment.

### b.    Count Nine

The final charge submitted to the jury for its consideration at Rubin's trial accused him with including in statements to state officials certain costs as being necessarily incurred by Allstate in the provision of patient care, despite the fact that petitioner knew that costs included in his filing with the DSS were not related to such care.

As was noted above, for a period of time Vetter and Rodriguez, both employees of Cripple Creek, were paid by Allstate through its company checks, despite the fact that they did not perform services for, or have any official title with, that company until after the State of New York began its audit of Allstate.  TT 1229-30,1255-56, 1285-86.  Rubin was responsible for placing Vetter and Rodriguez on the Allstate payroll, TT 1281, and their salaries were included in the 1995 Cost Report submitted by Rubin to the DSS as an administrative cost of that company, with no corresponding

entry which noted that the salary charge was a non-allowable expense.

TT 1469-70.  Based upon the foregoing, it is clear that a rational jury could

have convicted Rubin of the ninth count in the indictment, which charged

him with wrongfully certifying certain costs of Allstate as necessary for

patient care in the 1995 Cost Report filed with the DSS.

In sum, I agree with the Third Department's determination that there

"clearly [we]re valid lines of reasoning and permissible inferences that

could lead a rational person to the conclusion reached by the jury"

concerning Rubin's guilt of the crimes charged in counts eight and nine.

*Rubin*, 271 A.D.2d at 759, 706 N.Y.S.2d at 226.  As such, petitioner has

failed to establish that the Appellate Division's decision denying this

appellate claim is either contrary to, or an unreasonable application of,

*Jackson*.  I therefore recommend that the third ground in Rubin's petition

be denied.

### 4.    Ground Four

In the fourth ground of his petition, Rubin argues that he was denied

his rights to a fair trial, and to present evidence in his defense.  Petition

(Dkt. No. 1) at 7.  In support of that claim, petitioner contends that the trial

court precluded him from calling witnesses that would have refuted claims

63

made by prosecution witnesses.  Petition (Dkt. No. 1) at 7-8.  Rubin further

alleges that the limitations placed on him by the trial court during cross-

examination of prosecution witnesses prevented him from mounting an

adequate defense to the charges.  Petition (Dkt. No. 1) at 8.

> i.   Clearly Established Supreme Court Precedent

"The right to a fair trial ... has been called 'the most fundamental of

all freedoms.'" *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 586, 96

S.Ct. 2791, 2815 (1976) (Brennan, J., concurring) (quoting *Estes v. Texas*,

381 U.S. 532, 540, 85 S.Ct. 1628, 1631-32 (1965)).  "It is a right essential

to the preservation and enjoyment of all other rights, providing a

necessary means of safeguarding personal liberties against government

oppression."  *Stuart*, 427 U.S. at 586, 96 S.Ct. at 2815 (citing *Rideau v.

Louisiana*, 373 U.S. 723,  726-727, 83 S.Ct. 1417, 1419 (1963)); *see also,

United States v. Alvarez-Machain*, 504 U.S. 655, 661-62, 112 S.Ct. 2188,

2192-93 (1992) (due process of law is satisfied "when one present in court

is convicted of crime after having been fairly apprised of the charges

against him and after a fair trial in accordance with constitutional

procedural safeguards") (citation omitted); *see also Albright v. Oliver*, 510

U.S. 266, 273 n.6, 114 S.Ct. 807, 813 n.6 (1994) (a criminal defendant's

right to a fair trial is "mandated by the Due Process Clause") (citing *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399 (1976)); *Taylor v. Hayes*, 418 U.S. 488, 501-02, 94 S.Ct. 2697, 2704-05 (1974).

Additionally, "[t]he right to present evidence is, of course ... required by the Due Process Clause."  *Jenkins v. McKeithen*, 395 U.S. 411, 429, 89 S.Ct. 1843, 1853 (1969) (citing *Morgan v. United States*, 304 U.S. 1, 18, 58 S.Ct.773, 776 (1938)) (other citation omitted).  Where a habeas petitioner claims that he or she was denied his right to a fair trial, however, a federal habeas court's reviewing power is "the narrow one of due process ... not the broad power that [it] would possess in regard to [its] own trial court."  *See Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871 (1974).

      ii.   <u>Contrary To, or Unreasonable Application of, Supreme Court Precedent</u>

         a.   <u>Counts One through Seven</u>[31]

In support of his claim that he was denied his right to a fair trial as to counts one through seven, Rubin argues that the trial court improperly

---

[31]    Although I have concluded that petitioner's convictions on the second and third counts should be set aside based upon a finding of actual innocence, I will nonetheless address Rubin's other arguments regarding those convictions as potentially providing an alternative, independent basis for granting habeas relief as to those counts.

precluded him from calling Phyllis Wang and Barbara Gross as defense

witnesses in support of his defense to the pending charges.  Supporting

Mem. (Dkt. No. 8) at 36-37.   Rubin maintains that Wang would have

testified that Rubin never attended educational seminars conducted by the

State, at which the Public Charge Regulation was discussed, thereby

rebutting evidence presented by the prosecution suggesting that Rubin

was aware of that regulation in light of the lengths at which officials went

to educate providers within the industry regarding that regulation, including

through State-sponsored seminars.  Supporting Mem. (Dkt. No. 8) at 37.

Despite that evidence, the trial court precluded Rubin's counsel from

calling Wang, the head of the industry association to which Rubin

belonged, to testify to the effect that he did not attend any seminars

conducted by the state and that it was Susan Malavet, a key prosecution

witness, and not the petitioner, who was designated to receive association

literature.  TT 1541-45.

Petitioner also sought permission to call Barbara Gross, an

employee of the Dutchess County Department of Social Services

("Dutchess DSS"), as a witness to establish that on one occasion, Gross

requested that Allstate "take on" a class of Dutchess DSS clients at a rate

below Allstate Medicaid rate.  Supporting Mem. (Dkt. No. 8) at 37-38.

Petitioner argues that admission of Gross' testimony would have provided

"compelling state of mind testimony for the proposition that [Rubin] did not

believe merely charging less than Medicaid was illegal."  *Id.*

Finally, Rubin argues that the trial court improperly precluded him

from introducing into evidence internal memoranda written by an employee

of the DSS which, he contends, establishes that the meaning of the

phrase "general public" as utilized within various public health regulations,

is unclear and ambiguous.  Supporting Mem. (Dkt. No. 8) at 38.

Petitioner's claims challenging the propriety of the trial court's rulings

limiting the admission of this evidence must be viewed in conjunction with

the Second Circuit's observation that the United States Constitution

affords trial judges "wide latitude" in excluding evidence that is only

marginally relevant to the issues at hand, or which poses an undue risk of

confusion of the issues germane to the criminal trial.  *Wade v. Mantello*,

333 F.3d 51, 60 (2d Cir. 2003) (citation omitted).  Additionally, I note that

"[a] habeas petitioner bears 'a heavy burden of persuasion' when claiming

that he was denied his right to a fair trial."  *Jones*, 2004 WL 437468, at *4

(quoting *Peterson v. Scully*, 87CIV.1597, 1991 WL 135621, at *2

(S.D.N.Y. July 16, 1991) (other citations omitted).

With respect to Rubin's claim regarding the trial court's preclusion of

testimony for Phyliss Wang, the record reveals that during the course of

the trial, the issue of the admissibility of Wang's proposed testimony was

discussed by counsel and the court.  During a conference held to address

the issue, outside the presence of the jury, the following colloquy

occurred:

> Defense
> Counsel:  [Wang's testimony] goes to the fact of
> what [Rubin] knew and was he mistaken
> by what was reported to him....  And this
> witness is being proffered to defuse [the
> prosecution's] argument, unless your
> Honor will preclude them in summation
> from arguing that he was a member of
> the association, he must have known,
> they had seminars, and all that kind of
> stuff.
>
> The Court: Do you plan on doing that in
> summation?
>
> District
> Attorney:   No, your honor.
>
> The Court: Then you are precluded.
>
> Defense
> Counsel:   If he does it, I would hope your Honor
> would permit me.

The Court:  I'll permit you to reopen your case,
                  absolutely.

Defense
Counsel:    Fine.

The Court:  At the very least.

Defense
Counsel:    Thank you.

TT 1729-30.  Thus, contrary to Rubin's assertion (*see* Supporting Mem.

(Dkt. No. 8) at 37), the trial court never ruled that Wang could not be called

as a defense witness for any purpose.  Instead, the record reflects that

defense counsel implicitly withdrew his request to call Wang as a witness

after the prosecution agreed that it would not refer to certain evidence

during its summation.  TT 1729-30.

        Another witness proffered by the petitioner, but whose testimony was

rejected by the trial court, was Barbara Gross, who assisted Dutchess

County in implementing that county's Expanded In-Home Services for the

Elderly Program ("EISEP") as well as its Court Appointed Special Advocates

("CASA") program.  TT 1660.  Rubin sought to call Gross to elicit testimony

to the effect that at one point when CASA funds were unavailable for use by

the Dutchess DSS, she contacted Rubin and requested that Allstate provide

services for individuals participating in Dutchess County's EISEP program at

the EISEP rate – a rate lower than the Medicaid rate.[32]  Trial Tr. at 1661-62.

Rubin argued at trial, and now claims, that Gross was a crucial defense

witness because her testimony would have established that Rubin never

intended to commit any crime.  TT 1662-65; Supporting Mem. (Dkt. No. 8) at

37-38.

In denying Rubin's request to call Gross as a witness, the trial court

determined that whether she had asked Rubin to charge a particular rate for

EISEP participants did not excuse Rubin's conduct, and did not prove that

Rubin lacked the requisite intent with respect to the conduct charged in the

Indictment.  TT 1663.  Additionally, the prosecution noted that the Dutchess

DSS' EISEP clients were not properly considered members of the "general

public".  TT 1664.

The larceny charge and counts two through seven of the indictment

were prosecuted under the theory that Rubin improperly charged the DSS a

rate higher than that charged the general public for services provided by

Allstate.  Since Rubin has not established that the EISEP clients of

Dutchess County were appropriately viewed as members of the general

---

[32]     Unfortunately, neither the petitioner nor the respondent cited any
portion in the state court record where the trial court ruled on Rubin's request to call
Gross as a witness, thus leaving to the court the task of locating the relevant
portions of the transcript, which includes in excess of 1700 pages.

public, the trial court properly determined that Gross' proposed testimony was not germane to the charges brought against Rubin, and was therefore inadmissible at trial.[33]  *See* TT 1665.

Petitioner also claims that the trial court improperly precluded him from referencing DSS memoranda in his defense to the charges against him.  During his cross-examination of Rosemary Contompasis, a DSS employee who later worked with the DOH, Rubin sought to introduce into evidence two memoranda written by an assistant counsel for the DSS, in response to an inquiry made of that office by the New York State Association of Health Care Providers, Inc.  *See* TT 520-22; Record at 2498-501.  In denying defense counsel's requests to offer those memoranda into evidence, the trial court observed that the state employee who expressed her opinion that the term "general public" was unclear had done so in the context of analyzing a state regulation applicable to laboratories submitting claims for Medicaid reimbursement, thereby rendering those memoranda irrelevant to Rubin's defense to the charges against him.  TT 527-28.  In rejecting that evidence the trial court also reasoned that because the prosecution had established Allstate only charged one rate for non-Medicaid

---

[33]     The trial court characterized Gross' testimony as not "even remotely relevant."  TT 1665.

clients – either $11.50 per hour or $12.00 per hour depending upon the

month and year the services were requested – there was no dispute as to

what the term "general public" could have meant to Rubin in the context of

Allstate's rates, thereby rendering the DSS memoranda irrelevant.  TT 526-

28.[34]  I discern no error of constitutional proportions in connection with this

evidentiary ruling.

b.    <u>Counts Eight and Nine</u>

Addressing his conviction on count eight of the indictment, petitioner

argues that he was denied his right to a fair trial on that charge because the

trial court prevented his counsel from arguing in summation that Rubin

received no tangible benefit from filing the 1994 Cost Report containing

false information.  Supporting Mem. (Dkt. No. 8) at 45.  Rubin contends that

an argument that he had no financial incentive to include false information in

that report would have buttressed his claim that he never intended to

defraud the state.  *Id.*

Petitioner also challenges his conviction on count nine of the

_____

[34]    I note that in precluding the defense from offering those memoranda, the trial court declared that if it became apparent that there was confusion as to what was meant by the term "general public" during the course of Rubin's trial, or if it became apparent that Allstate charged more than one rate for the health care services it provided, Rubin would be afforded the opportunity to pursue that issue further at that time.  Trial Tr. at 535-36.

72

indictment, asserting that the trial court improperly limited questions posed by his counsel to prosecution witnesses during cross-examination, and wrongfully precluded defense counsel from presenting evidence and arguing in his summation that by not including the salaries of Vetter and Rodriguez as costs of Allstate in the 1995 Cost Report, neither Rubin nor the company realized any financial gain.  *Id.*  Rubin further contends that the trial court improperly prevented him from calling a witness whom, petitioner claims, would have contested the prosecution's theory concerning the proper method of allocating expenses on cost reports submitted to DSS, and that the trial court inappropriately "sided with the prosecution" on the factual issue relating to the proper method of accounting relating to Cripple Creek expenses.  *Id.*

As to Rubin's challenge to the fairness of his trial in light of the trial court's rulings precluding him from offering evidence or arguing in summation that he did not receive any pecuniary gain with respect to the false instruments filed with the DSS and forming the basis of the charges against him in counts eight and nine of the indictment, *see* Supporting Mem. (Dkt. No. 8) at 45, I note that petitioner was never charged with receiving any such gain, and the penal statute upon which those charges were based

73

similarly does not require a showing that the perpetrator receive any

financial gain as a result of his or her conduct.  *See* N.Y. Penal L. § 175.35;

*see also* TT 1557-58.  Thus, petitioner was not deprived of his right to a fair

trial when the trial court precluded him from introducing irrelevant evidence

concerning his claim that he did not receive a pecuniary gain because of the

false information contained in his filings.

       With respect to Rubin's additional challenges to the fairness of his trial

as relates to his conviction on the ninth count in the indictment, the record

reflects that the defense was prevented by the trial court from calling as a

witness Kathy Gill, whom petitioner claims would have rebutted See's

testimony that the Cripple Creek salaries could have been properly included

and thereafter disallowed as expenses in Allstate's 1995 Cost Report.  TT

1651-52.  As was noted earlier, See's testimony established that the

salaries of Vetter and Rodriguez were included in one portion of the 1995

Cost Report submitted to the DSS.  TT 1469.  Those salaries should

therefore have been deleted from that Cost Report as a non-allowable

expense of that company, but were not.  TT 1470.  Rubin did not establish

at trial, and does not appear to assert in this proceeding, that Gill would

have testified that the salaries of Vetter and Rodriguez, which were clearly

included in the 1995 Cost Report, were properly treated as a cost of

Allstate.  I therefore concur with the trial court's determination that Gill's

testimony was not relevant to Rubin's defense to count nine in the

indictment.  Moreover, since there was no evidence that the salaries of

those Cripple Creek employees were properly included in the 1995 Cost

Report, the trial court properly noted this fact on the record in overruling

defense counsel's objection during the portion of the prosecution's

summation which related to this issue.  TT 2075-76.  Thus, petitioner's claim

that such conduct on the part of the trial court deprived petitioner of his right

to a fair trial (Supporting Mem. at 46) is without merit.

Based upon the foregoing, I cannot conclude that the Third

Department's decision denying this aspect of Rubin's appeal, *see Rubin*,

271 A.D.2d at 760, 706 N.Y.S.2d at 226; *see also Rubin*, 286 A.D.2d at 556,

729 N.Y.S.2d at 562, is either contrary to, or represents an unreasonable

application of, the Supreme Court precedent noted above.  Accordingly, I

recommend that Rubin's fourth ground for relief be denied.

### 5. Ground Five

In his fifth ground, Rubin argues that the trial court improperly

punished Rubin based upon the exercise of his constitutional rights to a jury

trial and to defend himself against the charges brought against him.  Petition (Dkt. No. 1) at 8.

> i.   Clearly Established Supreme Court Precedent

"'To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort.'"  *United States v. Goodwin*, 457 U.S. 368, 372, 102 S.Ct. 2485, 2488 (1982) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 668 (1978)).  Thus, it is "patently unconstitutional" for a prosecutor "to pursue a course of action whose objective is to penalize a person's reliance on his legal rights." *Hayes*, 434 U.S. at 363, 98 S.Ct. at 668 (quotations omitted).  This notwithstanding, however, "due process does not in any sense forbid enhanced sentences or charges, but only enhancement motivated by actual vindictiveness toward the defendant for having exercised guaranteed rights." *Wasman v. United States*, 468 U.S. 559, 568, 104 S.Ct. 3217, 3223 (1984).

> ii.   Contrary To, or Unreasonable Application of, Supreme Court Precedent

Based upon a careful review of the transcript generated from Rubin's sentencing, I am unable to find any indication that the sentences imposed by the trial court were the product of any improper conduct or motivation, as ascribed by Rubin in his petition.

As a backdrop against which to assess this claim, I have considered that appropriate factors for a New York State court to weigh when imposing sentence on a convicted felon, including the purposes of penal sanctions, such as deterrence and societal protection. *See Naranjo v. Filion*, No. 02CIV.5449, 2003 WL 1900867, at \*4 (S.D.N.Y. Apr. 16, 2003).  In imposing its sentence on Rubin, the trial court noted that it was based in part on the court's goal of deterring others from committing Medicaid fraud. *See* Sentencing Transcript of Daniel Rubin (5/14/99) (reproduced in Record at 2596-2663) ("ST") at 62.  The court also observed that Rubin's criminal conduct was motivated by greed, and that the proof at trial established that Rubin stole in excess of $600,000 "from the government and indirectly [his] fellow citizens" for petitioner's own personal gain.  ST 62-64.  The trial court further remarked that in his defense to the charges, Rubin had "attempt[ed] to shamelessly escape responsibility by placing it on the shoulders of others."  ST 62-65.  I find no evidence supporting petitioner's claim that the trial court relied upon impermissible factors, instead of the legitimate points noted, or otherwise engaged in misconduct in imposing the sentence on petitioner.

I note, moreover, that sentence imposed did not exceed the maximum

term allowed by law.  That fact also appears to be fatal to any constitutional

challenge to petitioner's sentences, since as the Second Circuit has

observed, "[n]o federal constitutional issue is presented where ... the

sentence is within the range prescribed by state law." *White v. Keane*, 969

F.2d 1381, 1383 (2d Cir. 1992) (citing *Underwood v. Kelly*, 692 F.Supp. 146

(E.D.N.Y. 1988), *aff'd mem.*, 875 F.2d 857 (2d Cir. 1989)); *see also Jackson*

*v. Lacy*, 74 F.Supp.2d 173, 181 (N.D.N.Y. 1999) (McAvoy, C.J.) ("[i]t is

well-settled ... that a prisoner may not challenge the length of a sentence

that does not exceed the maximum set by state law").

Finally, the sentences which were imposed do not support a claim that

petitioner's Eighth Amendment right against cruel and unusual punishment

has been violated.  To establish such a violation, a petitioner must

demonstrate that the sentence imposed on him or her is "grossly

disproportionate to the severity of the crime." *Rummel v. Estelle*, 445 U.S.

263, 271, 100 S.Ct. 1133, 1138 (1980).  Outside the context of capital

punishment, however, "successful challenges to the proportionality of

particular sentences have been exceedingly rare." *Rummel*, 445 U.S. at

272, 100 S.Ct. at 1138; *see Harmelin v. Michigan*, 501 U.S. 957, 995, 111

S.Ct. 2680, 2701-02 (1991) (Eighth Amendment only forbids only sentences

which are "grossly disproportionate" to the crime).  A sentence of

imprisonment which is within the limits of a valid state statute is not cruel

and unusual punishment in the constitutional sense.  *See White*, 969 F.2d

at 1383; *Lou v. Mantello*, No. 98-CV-5542, 2001 WL 1152817, at *13

(E.D.N.Y. Sept. 25, 2001).  Neither the length of the sentences, nor the

consecutive nature of the sentence imposed with respect to Rubin's

conviction on the ninth count in the indictment, indicate any violation his

Eighth Amendment rights.[35]

In sum, I find that Rubin has not established that his sentences are

the product of any improper consideration or conduct of the trial court.

Accordingly, inasmuch as the sentences imposed are all within the range

permitted by law and are not grossly disproportionate to the crimes of which

---

[35]     The ninth count charged petitioner with improperly including the costs
associated with two employees of Cripple Creek in the 1995 Cost Report filed with
the DSS.  "Concurrent sentences are mandated in New York only if two or more
offenses are committed (1) 'through a single act or omission,' or (2) 'through an act
or omission which in itself constituted one of the offenses and also was a material
element of the other.'"  *Bethune v. Superintendent, Bare Hill Correctional Facility*,
299 F.Supp.2d 162, 166 (W.D.N.Y. 2004) (quoting New York Penal Law §
70.25(2)).  In determining whether concurrent sentences are required, courts are to
examine the statutory definition of the crimes for which the defendant has been
convicted.  *See People v. Mack*, 242 A.D.2d 543 (2d Dept. 1997) (citing *People v.
Laureano*, 87 N.Y.2d 640 (1996)) (other citations omitted).  It is clear that the false
instrument charge relating to the improper inclusion of the Cripple Creek expenses
in the 1995 Cost Report was properly considered a separate and distinct crime
when compared to the other false instrument charges, as well as the larceny
charge, of which petitioner was also found guilty.

he stands convicted, I therefore recommend that the fifth ground in Rubin's petition be denied.

### 6.   Ground Six

In his final claim for relief, petitioner argues that he received the ineffective assistance of trial counsel.  In support of this claim, petitioner argues that defense counsel requested language in the trial court's jury instructions that "clearly did not serve any rational interest of defendant, and that was contravened by the applicable statutes."  Petition (Dkt. No. 1) at 9.

### i.   Clearly Established Supreme Court Precedent

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence."  U.S. Const., Amend. VI.  To establish a violation of this right to the effective assistance of counsel, a habeas petitioner must typically show both 1) that counsel's representation fell below an objective standard of reasonableness, measured in the light of the prevailing professional norms; and 2) resulting prejudice – that is, a reasonable probability that, but for counsel's unprofessional performance, the outcome of the proceeding would have been different.  *Strickland v. Washington*, 466 U.S. 668, 688-90 (1984); *Wiggins v. Smith*, 539 U.S. 510,

80

520-21, 123 S.Ct. 2527, 2535 (2003) ("the legal principles that govern

claims of ineffective assistance of counsel" were established by the

Supreme Court in *Strickland*).

> ii.     Contrary To, or Unreasonable Application of, Supreme
>         Court Precedent

In support of his claim that he received ineffective assistance from his

trial counsel, Rubin argues that jury charges requested by defense counsel

"negated the critical *mens rea* requirements as to all counts, and the

language in question came from defense requests."  Supporting Mem. (Dkt.

No. 8) at 47.   Specifically, petitioner asserts that the trial court's charge

invited the jury to convict Rubin on counts two through seven of the

indictment if it merely concluded that Rubin had violated the Public Charge

Regulation, instead of requiring proof of his intent to violate that regulation.

Supporting Mem. (Dkt. No. 8) at 47-48.  Petitioner alleges that trial counsel's

requests to charge concerning counts eight and nine of the indictment

similarly dispensed with the *mens rea* requirement for a proper conviction on

those counts.  Supporting Mem. (Dkt. No. 8) at 48.

In providing the jury with the elements required to be proven by the

prosecution in order to support a conviction on counts two through seven,

the trial court charged the jury as follows:

> Now, in order for you to find the defendant guilty of [these] crime[s], the People are required to prove from all the evidence in the case beyond a reasonable doubt each of the following six elements for each of the six counts in the indictment: One, that on or about the dates listed in the indictments for counts 2,3,4,5,6 and 7, in the County of Albany, the defendant offered or presented to a public office or public servant ... Medicaid assistance program claim form[s] and accompanying provider transmittal certifications ...; two, that what the defendant offered or presented was a written instrument, that is, a computer diskette and accompanying provider transmittal certifications; three, that such written instrument contained a false statement or information, that is, that the defendant complied with the regulation concerning the relationship of his rate to the general public or the Allstate Home Care, Incorporated, rate to the general public, ... [and] six, that the defendant offered or presented such written instrument to [a] New York state agent with the intent to defraud the State, that is, that the rate that was billed was billed at a rate higher than the rate charged the general public.

TT 2157-59.

Petitioner argues that the wording of this charge indicates that the trial court equated "intent to defraud the State" with merely submitting a claim to the DSS which included a rate higher than the rate charged the general public.  Supporting Mem. (Dkt. No. 8) at 47.  In reviewing jury charges, however, it is appropriate for courts to presume that the jury considered the words contained in the charge in "their most common sense and logical

82

meaning." *Palmer v. Artuz*, No. 97 CIV. 5457, 1999 WL 1080311, at *3

(S.D.N.Y. Dec. 1, 1999).  Although petitioner suggests one interpretation of

the trial court's instructions on this issue, an equally plausible reading of the

charge – and one which seems more reasonable to this court – is that the

portion of the trial court's additional instructions which followed the words

"that is" did not modify the *mens rea* required for the crime but instead

merely provided the jury with the prosecution's theory regarding the manner

in which the People alleged that Rubin intentionally defrauded the state.

Immediately prior to the cited discussion of the six elements the prosecution

was required to establish Rubin's guilt of counts two through seven, the trial

court defined the word "defraud" as "cheat[ing] or depriv[ing] another person

of property or a thing of value."  TT 2156.  Thus, when the trial court

instructed the jury that the prosecution was required to prove that Rubin

"presented such written instrument ... with the intent to defraud the State,

that is, that the rate that was billed was billed at a rate higher than the rate

charged the general public", TT 2159, it appears to have been advising the

jury of the prosecution's theory that Rubin defrauded the state by

intentionally billing Medicaid at a rate higher than the rate charged the

general public.[36]

Rubin's ineffectiveness claim relating to the charge requested by defense counsel as to counts eight and nine similarly relies upon an interpretation of the trial court's charge that, while perhaps somewhat plausible, does not appear to this court to be reasonable in the context of the entire charge to the jury.  Thus, as to count eight, the trial court instructed the jury that the prosecution was required to prove, *inter alia*, that Rubin

> offered or presented such written instrument to
> [DSS] with the intent to defraud the State, that is,
> that the rate charged the general public for Level 2
> personal care services was not the rate listed in the
> personal care agency report.

TT 2163.  Although petitioner alleges that this charge eliminated the *mens rea* required for a conviction on that count, *see* Supporting Mem. (Dkt. No. 8) at 48, it appears that the trial court was simply advising the jury of the

---

[36]     Within that same charge, for example, the trial court employed a similar approach in discussing the third element of the crime charged.  Specifically, the trial court stated that the third element the People were required to prove was that the "written instrument [filed by Rubin] contained a false statement or information, that is, that the defendant complied with the regulation concerning the relationship of his rate to the general public or the Allstate Home Care, Incorporated, rate to the general public."  TT 2158.  By that language, the trial court appears to have simply been advising the jury of the false statement the prosecution alleged that Rubin had included in his filing with the DSS, and not eliminating the requirement that the statement be in writing.

manner in which the prosecution argued that Rubin had intentionally

defrauded the state – that is, by declaring that a certain rate was charged to

the general public for Level II personal care services in the 1994 Cost

Report filed with the DSS when Allstate charged for those services a lower

rate.  Similarly, as to count nine, the trial court stated that the prosecution

was required to prove, *inter alia*, that Rubin offered or presented a written

instrument to NYDSS "with the intent to defraud the State, that is, that

certain costs attributed as necessarily related to patient care were not so

related."  TT 2166-67.  As with my recommendation regarding this aspect of

the charge that related to counts two through eight of the indictment, I

conclude that in this portion of its charge, the trial court was merely advising

the jury of the manner in which the prosecution alleged that Rubin had

intentionally defrauded the state, and that trial court's instructions in no way

eliminated or diminished the *mens rea* requirement as to this charge.

In sum, I find that the trial court's instructions to the jury accurately

conveyed the elements the prosecution was required to prove beyond a

reasonable doubt as to counts two through nine.  Since there was no error

in those instructions, defense counsel's conduct in both formulating his

proposed charges and in failing to lodge any objections to the charge

actually given to the jury cannot be considered objectively unreasonable conduct.  The Appellate Division therefore properly rejected this appellate challenge asserted by Rubin, and petitioner's federal habeas claim alleging ineffective assistance must necessarily fail.

IV.     SUMMARY AND RECOMMENDATION

Petitioner's Rubin's claims which challenge the sufficiency of the evidence as to his convictions on counts two and three of the indictment appear to be meritorious, given the fact that the certification language upon which those courts were explicitly premised is not contained in the documents forming the basis for those counts.  Accordingly, I recommend that Rubin's habeas petition be granted as to these charges.  I further find, however, that the remaining challenges raised by Rubin concerning his conviction, including his challenge to the constitutionality of the Public Charge Regulation, lack merit, and accordingly recommend that his petition be denied as those remaining claims.  It is therefore hereby

RECOMMENDED, that Rubin's petition be GRANTED as to his convictions on Counts Two and Three of the Indictment, and it is further

RECOMMENDED, that Rubin's petition be DENIED with respect to his convictions on Counts One, Four, Five, Six, Seven, Eight and Nine of the

Indictment.

NOTICE:  pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation.  Any objections shall be filed with the clerk of the court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties by regular mail.

David E. Peebles
U.S. Magistrate Judge

Dated:     December 15, 2005
           Syracuse, NY